# WYATT *v.* COLE ET AL.

No. 91–126.   Argued January 14, 1992—Decided May 18, 1992

O'CONNOR, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, SCALIA, and KENNEDY, JJ., joined. KENNEDY, J., filed a concurring opinion, in which SCALIA, J., joined, *post*, p. 169. REHN-QUIST, C. J., filed a dissenting opinion, in which SOUTER and THOMAS, JJ., joined, *post*, p. 175.

*Jim Waide* argued the cause for petitioner. With him on the briefs were *Douglas M. Magee* and *Alan B. Morrison.*

*Joseph Leray McNamara* argued the cause and filed a brief for respondents.

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982), we left open the question whether private defendants charged with 42 U. S. C. § 1983 liability for invoking state replevin, garnishment, and attachment statutes later declared unconstitutional are entitled to qualified immunity from suit. 457 U. S., at 942, n. 23. We now hold that they are not.

## I

This dispute arises out of a soured cattle partnership. In July 1986, respondent Bill Cole sought to dissolve his partnership with petitioner Howard Wyatt. When no agreement could be reached, Cole, with the assistance of an

attorney, respondent John Robbins II, filed a state court complaint in replevin against Wyatt, accompanied by a replevin bond of $18,000.

At that time, Mississippi law provided that an individual could obtain a court order for seizure of property possessed by another by posting a bond and swearing to a state court that the applicant was entitled to that property and that the adversary "wrongfully took and detain[ed] or wrongfully detain[ed]" the property. 1975 Miss. Gen. Laws, ch. 508, § 1. The statute gave the judge no discretion to deny a writ of replevin.

After Cole presented a complaint and bond, the court ordered the county sheriff to seize 24 head of cattle, a tractor, and certain other personal property from Wyatt. Several months later, after a postseizure hearing, the court dismissed Cole's complaint in replevin and ordered the property returned to Wyatt. When Cole refused to comply, Wyatt brought suit in Federal District Court, challenging the constitutionality of the statute and seeking injunctive relief and damages from respondents, the county sheriff, and the deputies involved in the seizure.

The District Court held that the statute's failure to afford judges discretion to deny writs of replevin violated due process. 710 F. Supp. 180, 183 (SD Miss. 1989).[1] It dismissed the suit against the government officials involved in the seizure on the ground that they were entitled to qualified immunity. App. 17–18. The court also held that Cole and Robbins, even if otherwise liable under § 1983, were entitled to qualified immunity from suit for conduct arising prior to the statute's invalidation. *Id.*, at 12–14. The Court of Appeals for the Fifth Circuit affirmed the District Court's grant of qualified immunity to the private defendants. 928 F. 2d 718 (1991).

---

[1] The State amended the statute in 1990. Miss. Code Ann. § 11–37–101 (Supp. 1991).

We granted certiorari, 502 U. S. 807 (1991), to resolve a conflict among the Courts of Appeals over whether private defendants threatened with 42 U. S. C. § 1983 liability are, like certain government officials, entitled to qualified immunity from suit. Like the Fifth Circuit, the Eighth and Eleventh Circuits have determined that private defendants are entitled to qualified immunity. See *Buller* v. *Buechler*, 706 F. 2d 844, 850–852 (CA8 1983); *Jones* v. *Preuit & Mauldin*, 851 F. 2d 1321, 1323–1325 (CA11 1988) (en banc), vacated on other grounds, 489 U. S. 1002 (1989). The First and Ninth Circuits, however, have held that in certain circumstances, private parties acting under color of state law are not entitled to such an immunity. See *Downs* v. *Sawtelle*, 574 F. 2d 1, 15–16 (CA1), cert. denied, 439 U. S. 910 (1978); *Conner* v. *Santa Ana*, 897 F. 2d 1487, 1492, n. 9 (CA9), cert. denied, 498 U. S. 816 (1990); *Howerton* v. *Gabica*, 708 F. 2d 380, 385, n. 10 (CA9 1983). The Sixth Circuit has rejected qualified immunity for private defendants sued under § 1983 but has established a good faith defense. *Duncan* v. *Peck*, 844 F. 2d 1261 (1988).

## II

Title 42 U. S. C. § 1983 provides a cause of action against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *Carey* v. *Piphus*, 435 U. S. 247, 254–257 (1978).

In *Lugar* v. *Edmondson Oil Co., supra*, the Court considered the scope of § 1983 liability in the context of garnishment, prejudgment attachment, and replevin statutes. In that case, the Court held that private parties who attached a debtor's assets pursuant to a state attachment statute were subject to § 1983 liability if the statute was constitutionally

infirm. Noting that our garnishment, prejudgment attachment, and replevin cases established that private use of state laws to secure property could constitute "state action" for purposes of the Fourteenth Amendment, *id.*, at 932–935, the Court held that private defendants invoking a state-created attachment statute act "under color of state law" within the meaning of § 1983 if their actions are "fairly attributable to the State," *id.*, at 937. This requirement is satisfied, the Court held, if two conditions are met. First, the "deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Ibid.* Second, the private party must have "acted together with or . . . obtained significant aid from state officials" or engaged in conduct "otherwise chargeable to the State." *Ibid.* The Court found potential § 1983 liability in *Lugar* because the attachment scheme was created by the State and because the private defendants, in invoking the aid of state officials to attach the disputed property, were "willful participant[s] in joint activity with the State or its agents." *Id.*, at 941 (internal quotation marks omitted).

Citing *Lugar*, the District Court assumed that Cole, by invoking the state statute, had acted under color of state law within the meaning of § 1983, and was therefore liable for damages for the deprivation of Wyatt's due process rights. App. 12. With respect to Robbins, the court noted that while an action taken by an attorney in representing a client "does not normally constitute an act under color of state law, . . . an attorney is still a person who may conspire to act under color of state law in depriving another of secured rights." *Id.*, at 13. The court did not determine whether Robbins was liable, however, because it held that both Cole and Robbins were entitled to qualified immunity from suit at least for conduct prior to the statute's invalidation. *Id.*, at 13–14.

Although the Court of Appeals did not review whether, in the first instance, Cole and Robbins had acted under color of state law within the meaning of § 1983, it affirmed the District Court's grant of qualified immunity to respondents. In so doing, the Court of Appeals followed one of its prior cases, *Folsom Investment Co.* v. *Moore*, 681 F. 2d 1032 (CA5 1982), in which it held that "a § 1983 defendant who has invoked an attachment statute is entitled to an immunity from monetary liability so long as he neither knew nor reasonably should have known that the statute was unconstitutional." *Id.*, at 1037. The court in *Folsom* based its holding on two grounds. First, it viewed the existence of a common law, probable cause defense to the torts of malicious prosecution and wrongful attachment as evidence that "Congress in enacting § 1983 could not have intended to subject to liability those who in good faith resorted to legal process." *Id.*, at 1038. Although it acknowledged that a defense is not the same as an immunity, the court maintained that it could "transfor[m] a common law defense extant at the time of § 1983's passage into an immunity." *Ibid.* Second, the court held that while immunity for private parties is not derived from official immunity, it is based on "the important public interest in permitting ordinary citizens to rely on presumptively valid state laws, in shielding citizens from monetary damages when they reasonably resort to a legal process later held to be unconstitutional, and in protecting a private citizen from liability when his role in any unconstitutional action is marginal." *Id.*, at 1037. In defending the decision below, respondents advance both arguments put forward by the Court of Appeals in *Folsom*. Neither is availing.

## III

Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler* v. *Pachtman*, 424 U. S. 409, 417 (1976). Nonetheless, we have accorded certain government officials either absolute or qualified immu-

nity from suit if the "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'" *Owen* v. *City of Independence*, 445 U. S. 622, 637 (1980) (quoting *Pierson* v. *Ray*, 386 U. S. 547, 555 (1967)). If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U. S. C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. See *Tower* v. *Glover*, 467 U. S. 914, 920 (1984); *Imbler, supra,* at 421; *Pulliam* v. *Allen*, 466 U. S. 522, 529 (1984). Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions. *Tower, supra,* at 920. See also *Imbler, supra,* at 424–429.

In determining whether there was an immunity at common law that Congress intended to incorporate in the Civil Rights Act, we look to the most closely analogous torts—in this case, malicious prosecution and abuse of process. At common law, these torts provided causes of action against private defendants for unjustified harm arising out of the misuse of governmental processes. 2 C. Addison, Law of Torts ¶ 852, and n. 2, ¶ 868, and n. 1 (1876); T. Cooley, Law of Torts 187–190 (1879); J. Bishop, Commentaries on Non-Contract Law §§ 228–250, pp. 91–103, § 490, p. 218 (1889).

Respondents do not contend that private parties who instituted attachment proceedings and who were subsequently sued for malicious prosecution or abuse of process were entitled to absolute immunity. And with good reason; although public prosecutors and judges were accorded absolute immunity at common law, *Imbler* v. *Pachtman, supra,* at 421–424, such protection did not extend to complaining witnesses who, like respondents, set the wheels of government in motion by

instigating a legal action. *Malley* v. *Briggs*, 475 U. S. 335, 340–341 (1986) ("In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause").

Nonetheless, respondents argue that at common law, private defendants could defeat a malicious prosecution or abuse of process action if they acted without malice and with probable cause, and that we should therefore infer that Congress did not intend to abrogate such defenses when it enacted the Civil Rights Act of 1871. We adopted similar reasoning in *Pierson* v. *Ray*, 386 U. S., at 555–557. There, we held that police officers sued for false arrest under § 1983 were entitled to the defense that they acted with probable cause and in good faith when making an arrest under a statute they reasonably believed was valid. We recognized this defense because peace officers were accorded protection from liability at common law if they arrested an individual in good faith, even if the innocence of such person were later established. *Ibid.*

The rationale we adopted in *Pierson* is of no avail to respondents here. Even if there were sufficient common law support to conclude that respondents, like the police officers in *Pierson*, should be entitled to a good faith defense, that would still not entitle them to what they sought and obtained in the courts below: the qualified *immunity* from suit accorded government officials under *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982).

In *Harlow*, we altered the standard of qualified immunity adopted in our prior § 1983 cases because we recognized that "[t]he subjective element of the good-faith defense frequently [had] prove[d] incompatible with our admonition . . . that insubstantial claims should not proceed to trial." *Id.*, at 815–816. Because of the attendant harms to government effectiveness caused by lengthy judicial inquiry into subjective motivation, we concluded that "bare allegations of malice

should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.*, at 817–818. Accordingly, we held that government officials performing discretionary functions are shielded from "liability for civil damages insofar as their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*, at 818. This wholly objective standard, we concluded, would "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Ibid.*

That *Harlow* "completely reformulated qualified immunity along principles not at all embodied in the common law," *Anderson* v. *Creighton*, 483 U. S. 635, 645 (1987), was reinforced by our decision in *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985). *Mitchell* held that *Harlow* established an *"immunity from suit* rather than a mere defense to liability," which, like an absolute immunity, "is effectively lost if a case is erroneously permitted to go to trial." 472 U. S., at 526 (emphasis supplied). Thus, we held in *Mitchell* that the denial of qualified immunity should be immediately appealable. *Id.*, at 530.

It is this type of objectively determined, immediately appealable immunity that respondents asserted below.[2] But,

---

[2] In arguing that respondents are entitled to qualified immunity under *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), the dissent mixes apples and oranges. Even if we were to agree with the dissent's proposition that elements a plaintiff was required to prove as part of her case in chief could somehow be construed as a "'defense,'" *post*, at 176, n. 1, and that this "defense" entitles private citizens to some protection from liability, we cannot agree that respondents are entitled to *immunity from suit* under *Harlow*. One could reasonably infer from the fact that a plaintiff's malicious prosecution or abuse of process action failed if she could not affirmatively establish both malice and want of probable cause that plaintiffs bringing an analogous suit under § 1983 should be required to make a similar showing to sustain a § 1983 cause of action. Alternatively, if one accepts the dissent's characterization of the common law as establishing an affirmative "defense" for private defendants, then one could also conclude that private parties sued under § 1983 should likewise be entitled to

as our precedents make clear, the reasons for recognizing such an immunity were based not simply on the existence of a good faith defense at common law, but on the special policy concerns involved in suing government officials. *Harlow, supra,* at 813; *Mitchell, supra,* at 526. Reviewing these concerns, we conclude that the rationales mandating qualified immunity for public officials are not applicable to private parties.

Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. *Harlow, supra,* at 819; *Pierson, supra,* at 554; *Anderson, supra,* at 638. Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service. See, *e. g., Wood* v. *Strickland,* 420 U. S. 308, 319 (1975) (denial of qualified immunity to school board officials "'would contribute not to principled and fearless decision-making but to intimidation'") (quoting *Pierson, supra,* at 554); *Butz* v. *Economou,* 438 U. S. 478, 506 (1978) (immunity for Presidential aides warranted partly "to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority"); *Mitchell, supra,* at 526 (immunity designed to prevent the "'distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service'" (quoting *Harlow, supra,* at 816)). In

---

assert an affirmative defense based on a similar showing of good faith and/ or probable cause. In neither case, however, is it appropriate to make the dissent's leap: that because these common law torts partially included an objective component—probable cause—private defendants sued under § 1983 should be entitled to the objectively determined, immediately appealable immunity from suit accorded certain government officials under *Harlow.*

short, the qualified immunity recognized in *Harlow* acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.

These rationales are not transferable to private parties. Although principles of equality and fairness may suggest, as respondents argue, that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts, such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion. Unlike school board members, see *Wood, supra,* or police officers, see *Malley* v. *Briggs,* 475 U. S. 335 (1986), or Presidential aides, see *Butz, supra,* private parties hold no office requiring them to exercise discretion; nor are they principally concerned with enhancing the public good. Accordingly, extending *Harlow* qualified immunity to private parties would have no bearing on whether public officials are able to act forcefully and decisively in their jobs or on whether qualified applicants enter public service. Moreover, unlike with government officials performing discretionary functions, the public interest will not be unduly impaired if private individuals are required to proceed to trial to resolve their legal disputes. In short, the nexus between private parties and the historic purposes of qualified immunity is simply too attenuated to justify such an extension of our doctrine of immunity.

For these reasons, we can offer no relief today. The question on which we granted certiorari is a very narrow one: "[W]hether private persons, who conspire with state officials to violate constitutional rights, have available the good faith immunity applicable to public officials." Pet. for Cert. i. The precise issue encompassed in this question, and the only issue decided by the lower courts, is whether qualified immunity, as enunciated in *Harlow,* is available for private defendants faced with § 1983 liability for invoking a state replevin,

garnishment, or attachment statute. That answer is no. In so holding, however, we do not foreclose the possibility that private defendants faced with § 1983 liability under *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982), could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens. Because those issues are not fairly before us, however, we leave them for another day. Cf. *Yee* v. *Escondido*, 503 U. S., 519, 534–538 (1992).

## IV

As indicated above, the District Court assumed that under *Lugar* v. *Edmondson Oil Co., supra,* Cole was liable under § 1983 for invoking the state replevin under bond statute, and intimated that, but did not decide whether, Robbins also was subject to § 1983 liability. The Court of Appeals never revisited this question, but instead concluded only that respondents were entitled to qualified immunity at least for conduct prior to the statute's invalidation. Because we overturn this judgment, we must remand, since there remains to be determined, at least, whether Cole and Robbins, in invoking the replevin statute, acted under color of state law within the meaning of *Lugar.* The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring.

I join the opinion of the Court but find that a further and separate statement of my views is required.

I agree with what THE CHIEF JUSTICE writes in dissent respecting the historical origins of our qualified immunity jurisprudence but submit that the question presented to us requires that we reverse the judgment, as the majority holds. Indeed, the result reached by the Court is quite con-

sistent, in my view, with a proper application of the history THE CHIEF JUSTICE relates.

Both the Court and the dissent recognize that our original decisions recognizing defenses and immunities to suits brought under 42 U. S. C. § 1983 rely on analogous limitations existing in the common law when § 1983 was enacted. See *ante*, at 163–164; *post*, at 176–177. In *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951), we held that § 1983 had not eradicated the absolute immunity granted legislators under the common law. And in *Pierson* v. *Ray*, 386 U. S. 547, 555–557 (1967), we recognized that under § 1983 police officers sued for false arrest had available what we described as a "defense of good faith and probable cause," based on their reasonable belief that the statute under which they acted was constitutional. *Id.*, at 557. *Pierson* allowed the defense because with respect to the analogous common-law tort, the Court decided that officers had available to them a similar defense. The good-faith and probable-cause defense evolved into our modern qualified-immunity doctrine. *Ante*, at 165–166.

Our immunity doctrine is rooted in historical analogy, based on the existence of common-law rules in 1871, rather than in "freewheeling policy choice[s]." *Malley* v. *Briggs*, 475 U. S. 335, 342 (1986). In cases involving absolute immunity we adhere to that view, granting immunity to the extent consistent with historical practice. *Ibid.; Burns* v. *Reed*, 500 U. S. 478, 485 (1991); *Hafer* v. *Melo*, 502 U. S. 21, 28–29 (1991). In the context of qualified immunity for public officials, however, we have diverged to a substantial degree from the historical standards. In *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), we "completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action." *Anderson* v. *Creighton*, 483 U. S. 635, 645 (1987). The transformation

was justified by the special policy-concerns arising from public officials' exposure to repeated suits. *Harlow, supra,* at 813–814; *ante,* at 165–166. The dissent in today's case argues that similar considerations justify a transformation of common-law standards in the context of private-party defendants. *Post,* at 179–180. With this I cannot agree.

We need not decide whether or not it was appropriate for the Court in *Harlow* to depart from history in the name of public policy, reshaping immunity doctrines in light of those policy considerations. But I would not extend that approach to other contexts. *Harlow* was decided at a time when the standards applicable to summary judgment made it difficult for a defendant to secure summary judgment regarding a factual question such as subjective intent, even when the plaintiff bore the burden of proof on the question; and in *Harlow* we relied on that fact in adopting an objective standard for qualified immunity. 457 U. S., at 815–819. However, subsequent clarifications to summary-judgment law have alleviated that problem, by allowing summary judgment to be entered against a nonmoving party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett,* 477 U. S. 317, 322 (1986). Under the principles set forth in *Celotex* and related cases, the strength of factual allegations such as subjective bad faith can be tested at the summary-judgment stage.

It must be remembered that unlike the common-law judges whose doctrines we adopt, we are devising limitations to a remedial statute, enacted by the Congress, which "on its face does not provide for *any* immunities." *Malley, supra,* at 342 (emphasis in original). We have imported common-law doctrines in the past because of our conclusion that the Congress which enacted § 1983 acted in light of existing legal principles. *Owen* v. *City of Independence,* 445 U. S. 622, 637–638 (1980). That suggests, however, that we may not

transform what existed at common law based on our notions of policy or efficiency.

My conclusions are a mere consequence of the historical principles described in the dissent of THE CHIEF JUSTICE. The common-law tort actions most analogous to the action commenced here were malicious prosecution and abuse of process. *Post*, at 176. In both of the common-law actions, it was essential for the plaintiff to prove that the wrongdoer acted with malice and without probable cause. *Post*, at 176, n. 1. As THE CHIEF JUSTICE states, it is something of a misnomer to describe the common law as creating a good-faith *defense;* we are in fact concerned with the essence of the wrong itself, with the essential elements of the tort. The malice element required the plaintiff to show that the challenged action was undertaken with an unlawful purpose, though it did not require a showing of ill will towards the plaintiff. J. Bishop, Commentaries on Non-Contract Law § 232, p. 92 (1889). To establish the absence of probable cause, a plaintiff was required to prove that a reasonable person, knowing what the defendant did, would not have believed that the prosecution or suit was well grounded, or that the defendant had in fact acted with the belief that the suit or prosecution in question was without probable cause. *Id.*, § 239, at 95. Our cases on the subject, beginning with *Harlow* v. *Fitzgerald,* diverge from the common law in two ways. First, as THE CHIEF JUSTICE acknowledges, modern qualified immunity does not turn upon the subjective belief of the defendant. *Post*, at 178, n. 2. Second, the immunity diverges from the common-law model by requiring the defendant, not the plaintiff, to bear the burden of proof on the probable-cause issue. *Supra* this page.

The decision to impose these requirements under a rule of immunity has implications, though, well beyond a mere determination that one party or the other is in a better position to bear the burden of proof. It implicates as well the law's definition of the wrong itself. At common law the ac-

tion lay because the essence of the wrong was an injury caused by a suit or prosecution commenced without probable cause or with knowledge that it was baseless. To cast the issue in terms of immunity, however, is to imply that a wrong was committed but that it cannot be redressed. The difference is fundamental, for at stake is the concept of what society considers proper conduct and what it does not. Beneath the nomenclature lie considerations of substance.

*Harlow* was cast as an immunity case, involving as it did suit against officers of the Government. And immunity, as distinct, say, from a defense on the merits or an element of the plaintiff's cause of action, is a legal inquiry, decided by the court rather than a jury, and on which an interlocutory appeal is available to defendants. *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985). Whether or not it is correct to diverge in these respects from the common-law model when governmental agents are the defendants, we ought not to adopt an automatic rule that the same analysis applies in suits against private persons. See *ante*, at 166–167, n. 2. By casting the rule as an immunity, we imply the underlying conduct was unlawful, a most debatable proposition in a case where a private citizen may have acted in good-faith reliance upon a statute. And as we have defined the immunity, we also eliminate from the case any demonstration of subjective good faith. Under the common law, however, if the plaintiff could prove subjective bad faith on the part of the defendant, he had gone far towards proving both malice and lack of probable cause. Moreover, the question of the defendant's beliefs was almost always one for the jury. *Stewart* v. *Sonneborn*, 98 U. S. 187, 194 (1879).

It is true that good faith may be difficult to establish in the face of a showing that from an objective standpoint no reasonable person could have acted as the defendant did, and in many cases the result would be the same under either test. This is why *Stewart* describes the instances where the probable cause turns on subjective intent as the exceptional

case. *Ibid.; post,* at 178, n. 2. That does not mean, however, that we may deprive plaintiffs of the opportunity to make their case. In some cases eliminating the defense based on subjective good faith can make a real difference, and again the instant case of alleged reliance on a statute deemed valid provides the example. It seems problematic to say that a defendant should be relieved of liability under some automatic rule of immunity if objective reliance upon a statute is reasonable but the defendant in fact had knowledge of its invalidity. Because the burden of proof on this question is the plaintiff's, the question may be resolved on summary judgment if the plaintiff cannot come forward with facts from which bad faith can be inferred. But the question is a factual one, and a plaintiff may rely on circumstantial rather than direct evidence to make his case. *Siegert* v. *Gilley,* 500 U. S. 226, 236 (1991) (KENNEDY, J., concurring in judgment). The rule, of course, also works in reverse, for the existence of a statute thought valid ought to allow a defendant to argue that he acted in subjective good faith and is entitled to exoneration no matter what the objective test is.

The distinction I draw is important because there is support in the common law for the proposition that a private individual's reliance on a statute, prior to a judicial determination of unconstitutionality, is considered reasonable as a matter of law; and therefore under the circumstances of this case, lack of probable cause can *only* be shown through proof of subjective bad faith. *Birdsall* v. *Smith,* 158 Mich. 390, 394, 122 N. W. 626, 627 (1909). Thus the subjective element dismissed as exceptional by the dissent may be the rule rather than the exception.

I join the opinion of the Court because I believe there is nothing contrary to what I say in that opinion. See *ante,* at 169 ("[W]e do not foreclose the possibility that private defendants faced with § 1983 liability . . . could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private . . . parties could

require plaintiffs to carry additional burdens"). Though they described the issue before them as "good-faith immunity," both the District Court and the Court of Appeals treated the question as one of law. App. 12–14; 928 F. 2d 718, 721–722 (CA5 1991). The Court of Appeals in particular placed heavy reliance on the policy considerations favoring a rule that citizens may rely on statutes presumed to be valid. *Ibid.* The latter inquiry, as *Birdsall* recognizes, however, goes mainly to the question of objective reasonableness. I do not understand either the District Court or the Court of Appeals to make an unequivocal finding that the respondents before us acted with subjective good faith when they filed suit under the Mississippi replevin statute. Furthermore, the question on which we granted certiorari was the narrow one whether private defendants in § 1983 suits are entitled to the same qualified immunity applicable to public officials, *ante,* at 168, which of course would be subject to the objective standard of *Harlow* v. *Fitzgerald.* Under my view the answer to that question is no. Though it might later be determined that there is no triable issue of fact to save the plaintiff's case in the matter now before us, on remand it ought to be open to him at least in theory to argue that the defendants' bad faith eliminates any reliance on the statute, just as it ought to be open to the defendants to show good faith even if some construct of a reasonable person in the defendants' position would have acted in a different way.

So I agree the case must be remanded for further proceedings.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SOUTER and JUSTICE THOMAS join, dissenting.

The Court notes that we have recognized an immunity in the § 1983 context in two circumstances. The first is when a similarly situated defendant would have enjoyed an immunity at common law at the time § 1983 was adopted. *Ante,* at 163–164. The second is when important public policy con-

cerns suggest the need for an immunity. *Ante,* at 166–167. Because I believe that both requirements, as explained in our prior decisions, are satisfied here, I dissent.

First, I think it is clear that at the time § 1983 was adopted, there generally was available to private parties a good-faith defense to the torts of malicious prosecution and abuse of process.[1] See authorities cited *ante,* at 164; *Malley* v. *Briggs,* 475 U. S. 335, 340–341 (1986) (noting that the generally accepted rule at common law was that a person would be held liable if "the complaint was made maliciously and without probable cause"); *Pierson* v. *Ray,* 386 U. S. 547, 555 (1967) (noting that at common law a police officer sued for false arrest can rely on his own good faith in making the arrest). And while the Court is willing to assume as much, *ante,* at 165, it thinks this insufficient to sustain respondents' claim to an immunity because the "qualified immunity" respondents' seek is not equivalent to such a "defense," *ante,* at 165–166.

But I think the Court errs in suggesting that the availability of a good-faith common-law defense at the time of § 1983's adoption is not sufficient to support their claim to immunity. The case on which respondents principally rely, *Pierson,* considered whether a police officer sued under § 1983 for false arrest could rely on a showing of good faith in order to escape liability. And while this Court concluded that the officer could rely on his own good faith, based in large part on the fact that a good-faith defense had been available at common law, the Court was at best ambiguous as to whether it

---

[1] Describing the common law as providing a "defense" is something of a misnomer—under the common law it was plaintiff's burden to establish as elements of the tort both that the defendant acted with malice *and* without probable cause. T. Cooley, Law of Torts 184–185 (1879); J. Bishop, Commentaries on Non-Contract Law § 225, p. 90 (1889). Referring to the defendant as having a good-faith defense is a useful shorthand for capturing plaintiff's burden and the related notion that a defendant could avoid liability by establishing *either* a lack of malice or the presence of probable cause.

was recognizing a "defense" or an "immunity." Compare 386 U. S., at 556 (criticizing Court of Appeals for concluding that no "immunity" was available), with *id.*, at 557 (recognizing a good-faith "defense"). Any initial ambiguity, however, has certainly been eliminated by subsequent cases; there can be no doubt that it is a qualified immunity to which the officer is entitled. See *Malley, supra,* at 340. Similarly, in *Wood* v. *Strickland,* 420 U. S. 308, 318 (1975), we recognized that, "[a]lthough there have been differing emphases and formulations of the common-law immunity," the general recognition under state law that public officers are entitled to a good-faith defense was sufficient to support the recognition of a § 1983 immunity.

Thus, unlike the Court, I think our prior precedent establishes that a demonstration that a good-faith defense was available at the time § 1983 was adopted does, in fact, provide substantial support for a contemporary defendant claiming that he is entitled to qualified immunity in the analogous § 1983 context. While we refuse to recognize a common-law immunity if § 1983's history or purpose counsel against applying it, *ante,* at 164, I see no such history or purpose that would so counsel here.

Indeed, I am at a loss to understand what is accomplished by today's decision—other than a needlessly fastidious adherence to nomenclature—given that the Court acknowledges that a good-faith defense will be available for respondents to assert on remand. Respondents presumably will be required to show the traditional elements of a good-faith defense—either that they acted without malice *or* that they acted with probable cause. See n. 1, *supra; Stewart* v. *Sonneborn,* 98 U. S. 187, 194 (1879); W. Prosser, Law of Torts § 120, p. 854 (4th ed. 1971). The first element, "maliciousness," encompasses an inquiry into subjective intent for bringing the suit. *Stewart, supra,* at 192–193; Prosser, *supra,* § 120, at 855. This quite often includes an inquiry into the defendant's subjective belief as to whether he be-

lieved success was likely. See, *e. g.,* 2 C. Addison, Law of Torts ¶ 854 (1876) ("Proof of the absence of belief in the truth of the charge by the person making it . . . is almost always involved in the proof of malice"). But the second element, "probable cause," focuses principally on *objective* reasonableness. *Stewart, supra,* at 194; Prosser, *supra,* § 120, at 854. Thus, respondents can successfully defend this suit simply by establishing that their reliance on the replevin statute was objectively reasonable for someone with their knowledge of the circumstances. But this is precisely the showing that entitles a public official to immunity. *Harlow* v. *Fitzgerald,* 457 U. S. 800, 818 (1982) (official must show his action did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known").[2]

Nor do I see any reason that this "defense" may not be asserted early in the proceedings on a motion for summary judgment, just as a claim to qualified immunity may be. Provided that the historical facts are not in dispute, the presence or absence of "probable cause" has long been acknowledged to be a question of law. *Stewart, supra,* at 193–194; 2 Addison, *supra,* ¶ 853, n. (p); J. Bishop, Commentaries on Non-Contract Law § 240, p. 95 (1889). And so I see no reason that the trial judge may not resolve a summary judgment motion premised on such a good-faith defense, just as we have encouraged trial judges to do with respect to qualified

---

[2] There is perhaps one small difference between the historic common-law inquiry and the modern qualified immunity inquiry. At common law, a plaintiff can show the lack of probable cause either by showing that the actual facts did not amount to probable cause (an objective inquiry) or by showing that the defendant lacked a sincere belief that probable cause existed (a subjective inquiry). Bishop, Commentaries on Non-Contract Law § 239, at 95. But relying on the subjective belief, rather than on an objective lack of probable cause, is clearly exceptional. See *Stewart* v. *Sonneborn,* 98 U. S. 187, 194 (1879) (describing subjective basis for finding lack of probable cause as exception to general rule). I see no reason to base our decision whether to extend a contemporary, objectively based qualified immunity on the exceptional common-law case.

immunity claims. *Harlow, supra,* at 818. Thus, private defendants who have invoked a state attachment law are put in the same position whether we recognize that they are entitled to qualified immunity or if we instead recognize a good-faith defense. Perhaps the Court believes that the "defense" will be less amenable to summary disposition than will the "immunity"; perhaps it believes the defense will be an issue that must be submitted to the jury, see *ante,* at 168 (referring to cases such as this "proceed[ing] to trial"). While I can see no reason why this would be so (given that probable cause is a legal question), if it is true, today's decision will only manage to increase litigation costs needlessly for hapless defendants.

This, in turn, leads to the second basis on which we have previously recognized a qualified immunity—reasons of public policy. Assuming that some practical difference will result from recognizing a defense but not an immunity, I think such a step is neither dictated by our prior decisions nor desirable. It is true, as the Court points out, that in abandoning a strictly historical approach to § 1983 immunities we have often explained our decision to recognize an immunity in terms of the special needs of public officials. But those cases simply do not answer—because the question was not at issue—whether similar (or even completely unrelated) reasons of public policy would warrant immunity for private parties as well.

I believe there are such reasons. The normal presumption that attaches to any law is that society will be benefited if private parties rely on that law to provide them a remedy, rather than turning to some form of private, and perhaps lawless, relief. In denying immunity to those who reasonably rely on presumptively valid state law, and thereby discouraging such reliance, the Court expresses confidence that today's decision will not "unduly impai[r]," *ibid.,* the public interest. I do not share that confidence. I would have thought it beyond peradventure that there is strong public

interest in encouraging private citizens to rely on valid state laws of which they have no reason to doubt the validity. *Buller* v. *Buechler*, 706 F. 2d 844, 851 (CA8 1983); *Folsom Investment Co.* v. *Moore*, 681 F. 2d 1032, 1037–1038 (CA5 1982).

Second, as with the police officer making an arrest, I believe the private plaintiff's lot is "not so unhappy" that he must forgo recovery of property he believes to be properly recoverable through available legal processes or to be "mulcted in damages," *Pierson*, 386 U. S., at 555, if his belief turns out to be mistaken. For as one Court of Appeals has pointed out, it is at least passing strange to conclude that private individuals are acting "under color of law" because they invoke a state garnishment statute and the aid of state officers, see *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982), but yet deny them the immunity to which those same state officers are entitled, simply because the private parties are not state employees. *Buller, supra,* at 851. While some of the strangeness may be laid at the doorstep of our decision in *Lugar*, see 457 U. S., at 943 (Burger, C. J., dissenting); and *id.,* at 944–956 (Powell, J., dissenting), there is no reason to proceed still further down this path. Our § 1983 jurisprudence has gone very far afield indeed, when it subjects private parties to greater risk than their public counterparts, despite the fact that § 1983's historic purpose was "to prevent *state officials* from using the cloak of their authority under state law to violate rights protected against state infringement." *Id.,* at 948 (emphasis added). See also *Monroe* v. *Pape*, 365 U. S. 167, 175–176 (1961).

Because I find today's decision dictated neither by our own precedent nor by any sound considerations of public policy, I dissent.