Peter GOODNOW, Plaintiff,

v.

Kenneth PALM, Emsa Correctional Care, Inc. Defendants.

No. 2:99–CV–132.

United States District Court, D. Vermont.

May 23, 2003.

Richard T. Cassidy, Esq., Hoff Curtis, Burlington, VT, for Plaintiff.

J. Davis Buckley, Theriault & Joslin, Montpelier, VT, for Defendant.

## OPINION AND ORDER

SESSIONS, Chief Judge.

In his *pro se* Complaint, Plaintiff Peter Goodnow alleges that Defendants Kenneth Palm and EMSA Correctional Care, Inc. (collectively "EMSA") have deprived him of his constitutional rights.[1] On September 12, 2002, Palm and EMSA moved for summary judgment as to all of Goodnow's

---

1. Although his Complaint was filed *pro se,* Goodnow is now represented by counsel.

claims for compensatory and punitive damages. For the reasons stated below, the Court **DENIES** EMSA's motion for summary judgment.

**Factual Background**

The following facts are viewed, as they must be when considering a motion for summary judgment, in the light most favorable to the non-moving party, Peter Goodnow. Goodnow was convicted of an offense in Vermont state court and sentenced to a term of imprisonment. He was initially incarcerated in Vermont but was later transferred to a facility in Virginia, in accordance with a contract between the two states. While incarcerated in Virginia, Goodnow felt a tooth break inside his mouth at the gum line. Shortly thereafter, he was returned to Vermont, to the Northwest Correctional Facility near St. Albans. On December 9, 1998, he was transferred in-state to a correctional facility near Newport, Vermont.

EMSA has a contract with the state of Vermont to provide all medical and dental care for prisoners in the state correctional system. Under the terms of this contract, all new inmates are required to receive medical screening within twenty-four hours. Goodnow received his screening on December 9, 1998, during which he complained of dental pain.

Six days later, on December 15, Goodnow was examined by Kenneth Palm, a dentist employed by EMSA, who confirmed that a large amalgam had been dislodged from Goodnow's tooth Number 30 and that other teeth had cavities and would require restorations. When Goodnow requested a crown for tooth Number 30, Palm explained that restorations would be more appropriate pursuant to EMSA and Vermont Department of Correction (DOC) policy. Palm did not treat Good-

now, but developed a treatment plan that began with restoration of tooth Number 30. The plan did not specify timing, but Palm told Goodnow that he would have to wait awhile for treatment, possibly more than a year to have the restorations completed.

After waiting approximately six weeks, on February 2, 1999, Goodnow filed an Inmate Medical Request Form or "sick slip" in which he stated, "I need to see the dentists, my teeth hurt." Defs.' Mot., Ex. 6. EMSA contends that at the time of Goodnow's request, there was a backlog of dental appointments and that "emergencies, infections and residents complaining of severe pain [were] a priority." Defs.' Mot., Ex. 8. Goodnow did, however, see a nurse the day after the request, on February 3, 1999. Nurse Paulette Simard examined Goodnow and reported that he had "[n]o facial edema; no foul odor; no drainage . . . ." and that he was "calm, laughing, comfortable." She did, however, refer Goodnow to Palm for evaluation and treatment. No such evaluation or treatment ever occurred.

On May 22, 1999, Goodnow filed a Vermont Department of Corrections Grievance in which he stated, "My teeth hurt. Why haven't I had my dental work done in 5 months?" Defs.' Mot., Ex. 7. In the grievance, Goodnow indicated that he had also complained to the Prison Superintendent Lanman, but that she had told him that "she ha[d] no control over medical." The same EMSA nurse who had seen Goodnow on February 3 was assigned to investigate the grievance. The nurse reported generally about back-logs and priorities and noted that Goodnow had not filed any "sick slips" since February 2, 1999.[2] The grievance was faxed to Palm

2. Goodnow disputes this fact.

and was either dismissed or for other reasons never acted upon.

Goodnow was next seen on July 26, 1999 by Dr. John Holbach, to whom Goodnow complained of bleeding problems in his mouth. Holbach confirmed Palm's original diagnosis that tooth Number 30 needed to be restored and developed a new treatment plan accordingly. Three days later, on July 29, 1999, Goodnow was again transferred to Greensville Correctional Center ("GCC") in Virginia pursuant to a contract between the states.

The GCC dental staff noted that as of March 31, 2000, Goodnow was only in need of routine cleaning. GCC's dentist declined to work on tooth Number 30, deciding to leave it "as is." He did, however, complete corrective work on tooth Number 20.[3]

Goodnow filed suit against EMSA and Palm alleging that they have deprived him of his constitutional rights. Specifically, he alleges that EMSA "[d]enied dental care, and forced [him] to suffer great pain. While in the Virginia facility, plaintiffs (sic) tooth broke off at the gum line. This caused great pain and suffering." Compl. ¶ (3). His Complaint further states that:

> Once back at the Newport facility around December 30, 1998 plaintiff saw dentist, Kenneth Palm. Palm advised plaintiff needed cap on the broken tooth, and cavities filled. [Palm] then advised that he would not do the dental work needed. He states that they don't do caps, and they are to (sic) busy to do the cavities. Plaintiffs (sic) mother called Superintendent Kathleen Lanman around 10–15 times, and was told the dental work would be done. On 4–22–99 Kathleen Lanman advised plaintiff in

the yard, she has "No control over medical staff, they are controlled by EMSA." *Id.* Goodnow has asked for proper dental care, i.e., that his tooth Number 30 be repaired and his cavities filled, and for $100,000 in damages and other appropriate relief.

In an April 14, 2003 Affidavit, Goodnow stated

> My tooth is very sensitive to temperatures. It hurts to chew on the right side of my mouth. I cannot eat anything cold, like ice cream, because that causes severe pain. When I brush my teeth in the morning, the cold water causes severe pain. I can't simply turn on the hot water and let it run until it gets warm because there usually isn't any hot water available. Even when I breathe, the cold air causes severe pain in my tooth.

On April 4, 2003, Goodnow was examined by Vermont Dentist John Summerville, D.M.D. who signed an affidavit which reads, in pertinent part,

> [Goodnow's] tooth No. 30, on the lower right side of his jaw, has a good bit of the crown fractured away. Mr. Goodnow described to me various pains that he experiences, particularly in connection with cold. Temperature sensitivity, especially cold, is a symptom consistent with a fractured tooth where the dentin is exposed. Restorative work is appropriate where there is active dental disease or where tooth structure is missing.

### Summary Judgment Standard

Under Federal Rule of Civil Procedure 56©, summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

**3.** Without passing judgment on the GCC dentist's assessment, it is noteworthy that in a September 6, 2000 Order, Magistrate Judge Niedermeier expressed concern over the status of corrective work for tooth Number 30.

gether with affidavits ... show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is precluded if a disputed fact exists that might affect the outcome of the suit under controlling substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The burden is on the moving party to demonstrate the absence of a genuine issue of material fact, and in considering the motion, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### Discussion

EMSA has made a number of arguments for summary judgment. First, it argues that Goodnow cannot, under 42 U.S.C. § 1983, through the doctrine of *respondeat superior*, obtain money damages because he has not demonstrated any "personal responsibility" on the part of EMSA as an employer. Second, EMSA contends that even if the Court concludes that he can make such a claim, Goodnow has not pled sufficient facts to meet either the subjective or objective prong required in this Circuit and under the Constitution to prove cruel and unusual punishment. Third, EMSA argues that it is entitled to summary judgment because it relied in good faith upon the constitutional validity of a contract and policies approved by the state of Vermont.

### Respondeat Superior

█ Relying upon *Johnson v. Glick*, EMSA argues that because Goodnow seeks "monetary damages ... under 42 U.S.C. § 1983,[4] the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.1973). In *Johnson*, the court dismissed a § 1983 claim against a prison warden on the basis that he was not personally involved in or responsible for the incident in question. The inmate in that case, however, only alleged an isolated incident in which a guard beat and detained him and then denied medical treatment to him in violation of his constitutional rights. *See id.* The Second Circuit found that such an incident was unforeseeable by higher authority because there was no evidence of an organizational or institutional awareness of the violation. *See id.* On that basis, the court dismissed the claim against the warden.[5] *See id; but see Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir.1970) (conditioning a conclusion of liability on part of warden on a finding that he was personally "responsible for what the guards did").

Goodnow, on the other hand, has alleged that his treatment/non-treatment involved several different EMSA employees and has otherwise demonstrated the possibility of a broader awareness of his problem. In doing so, he has established genuine issues of material fact to clear this summary judgment hurdle, even without the benefit

---

**4.** § 1983 states that:

Every person who, under color of any statute, ordinance, religion, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

**5.** Notably, it did so without prejudice so that the plaintiff could provide more evidence that the alleged violation was part of a systematic or historical practice that the warden was aware of or had authorized.

of a less stringent pleading standard afforded to *pro se* complaints.[6]

■ "Private employers are not liable under § 1983 for the constitutional torts of their employees ... unless the plaintiff proves the action pursuant to an official ... policy of some nature caused a constitutional tort." *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990).[7] EMSA's own argument connects its policies to Palm's decisions and could be found to demonstrate that it failed to provide dental treatment to Goodnow because of its practices or flawed practices as an institution.

EMSA has argued that administrative back-logs and patient prioritization, not deliberate indifference, led to the delay in Goodnow's treatment. It points to statements of EMSA personnel during and after examination of Goodnow to reinforce this argument. Indeed, at Goodnow's December 15, 1998 screening, Palm stated that a patient back-log and EMSA's prioritization of more serious cases might delay treatment for up to a year. The nurse who examined Goodnow on February 3 documented the delay in treating him as pursuant to a practice of prioritizing more serious cases. Such statements could lead a reasonable jury to find "personal responsibility" on the part of EMSA as an employer.

Moreover, EMSA's and Vermont DOC's records demonstrate that a number of EMSA personnel—including at least one of its nurses and two of its dentists—were aware of Goodnow's condition and that he was in pain. Goodnow complained to Superintendent Lanman and submitted a sick slip on February 2, 1999 indicating that his "teeth hurt." EMSA noted his verbal complaint to Superintendent Lanman. He filed a formal grievance on May 22, 1999 stating "[m]y teeth hurt. Why haven't I had my dental work done in five months?" A jury could reasonably find that these submissions and expressions of pain to these individuals resulted in an organizational awareness that Goodnow was experiencing mouth pain.[8]

Finally, EMSA's contract with Vermont requires that it provide a "program of on-site dental services which includes preventive and restorative care .... Inmates will be seen based on the list of dental priorities." When Goodnow requested dental care, EMSA was obligated to provide a dentist who would complete such care in a way that did not violate Goodnow's constitutional rights. If its policy and protocols have insufficient checks on its doctors by which a patient is left without care for an unreasonable amount of time, EMSA could be held institutionally responsible for such delays. *See Wright v. McMann*, 460 F.2d 126, 134 (2d Cir.1972) (upholding a damage award against warden, stressing that

6. Goodnow filed the above complaint *pro se.* Where the plaintiff alleges civil rights violations and the complaint is filed *pro se,* the pleadings are to be read generously by the court. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998).

7. Under the settlement agreement in *Goldsmith v. Dean*, No. 2:93–CV–383 (D.Vt.1993) and the contract EMSA signed with Vermont pursuant to that agreement, EMSA is obligated as an organization to provide dental care to prisoners.

8. It is also noteworthy that according to Goodnow's Complaint, Prison Superintendent Kathleen Lanman advised him that EMSA had control over all medical staff. This statement reflects not only EMSA's organizational responsibility for dental issues like Goodnow's, but also illustrates why he chose to assert his claims against both Dr. Palm and EMSA.

"there is every reason to believe that he was aware of segregation cell conditions," and that "responsibility for permitting such conditions to exist was ultimately, in any event, squarely his").

In short, the expressions of pain and related submissions to EMSA authorities documented in Goodnow's Complaint and in his April 14, 2003 Affidavit, combined with EMSA's admission that Goodnow's treatment would be delayed as a matter of the company's overall back-log and priority placement, leads the Court to conclude that a reasonable jury could implicate EMSA and its treatment policies and plans as part of the conduct in question.

### Cruel and Unusual Punishment

█ EMSA argues that even if the Court does find that Goodnow can pursue his claims on the basis of *respondeat superior,* he has failed to plead sufficient facts to establish a claim of cruel and unusual punishment under the Eighth Amendment. According to the Second Circuit, Eighth Amendment violations involve "a condition of urgency" that may result in "degeneration" or "extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To support a § 1983 claim for violation of the Eighth Amendment, Goodnow must show that EMSA acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Second Circuit has further defined this standard:

> First the alleged deprivation must be in objective terms 'sufficiently serious.' Second, the charged official must act with sufficiently culpable state of mind .... Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. More specifically, a pris-

on official does not act in a deliberately indifferent manner unless that official knows of and disregards an excessive risk to inmate health and safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

### Sufficiently Serious

What fits within the "sufficiently serious" category is difficult to define with precision. As the Second Circuit put it, "[i]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' ...." *Chance v. Armstrong,* 143 F.3d 698, 702–703 (2d Cir. 1998). The *Chance* court reasoned that "[a] prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery." 143 F.3d at 702–703. But if prison officials "deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment." *Id. Compare Arce v. Banks,* 913 F.Supp. 307, 309–10 (S.D.N.Y.1996) (small cyst-like growth on forehead not sufficiently serious), *with Gutierrez v. Peters,* 111 F.3d 1364, 1373–74 (7th Cir.1997) (large cyst that had become infected was a serious medical condition).

█ Several circuits, including the Second Circuit, have acknowledged that a serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Chance,* 143 F.3d at 702–703 (quoting *Gutierrez,* 111 F.3d at 1373 (cita-

tion omitted)). Factors that have been considered include: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992)); *accord Gutierrez*, 111 F.3d at 1373 (collecting cases from other circuits employing a similar standard). *Cf. Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.1996) (inmate's need for prescription eyeglasses constituted a serious medical condition where, as result of not having glasses, the inmate suffered headaches, his vision deteriorated, and he was impaired in daily activities).

"A cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, and the inability to engage in normal activities." *Chance*, 143 F.3d at 702–703 (citing *Fields v. Gander*, 734 F.2d 1313, 1314–15 (8th Cir.1984)) ("severe pain" due to infected tooth), (citing *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir.1995)) (three-week delay in dental treatment ag-

gravated problem),[9] (citing *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.1989)) (plaintiff complained that he was unable to eat properly); *cf. Dean v. Coughlin*, 623 F.Supp. 392, 404 (S.D.N.Y.1985) (holding that "dental needs—for fillings, crowns, and the like—are serious medical needs as the law defines that term"), vacated on other grounds, 804 F.2d 207 (2d Cir.1986).

■ Goodnow's Complaint states that his tooth (Number 30) broke off at the gum line, causing him severe pain. Palm conducted an initial medical assessment of Goodnow in December 1998 and determined that he was in good overall dental health, and only required routine fillings, but noted that he would start with tooth Number 30 because a large amalgam had been dislodged from it. On February 2, 1999, Goodnow submitted a "sick slip" that stated "[m]y teeth hurt." He was examined by a nurse the next day. According to the nurse's report, Goodnow did not present any facial or gum line edema, foul odor or oral drainage. She observed and recorded that Goodnow was "calm, laughing and comfortable." Goodnow's dental needs were classified as routine pursuant to the DOC Dental Policy and the DOC/EMSA Dental Protocols.[10] Such evidence

9. In *Harrison v. Barkley*, 219 F.3d 132, 136–138 (2d Cir.2000), the court noted that delay in treatment could exacerbate a routine dental problem, such as a cavity, to the degree that it becomes a serious condition:

> Ordinarily, a tooth cavity is not a serious medical condition, but that is at least in part because a cavity is so easily treatable. Absent intense pain or other exigency, the treatment of a cavity (in or out of prison) can safely be delayed by the dentist's schedule or the patient's dread or neglect, can be subject to triage or the management of care, can be mitigated or repaired temporarily, and can be coordinated with other related conditions that need to be treated together. Nevertheless, a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce

agony and to require more invasive and painful treatments, such as root canal therapy or extraction. *See* 1993 Public Health Reports 1993, U.S. Department of Health and Human Services, Pub. No. 108: 657–672.

It is noteworthy that in addition to complaints about his fractured tooth Number 30, Goodnow complained about pain in other parts of his mouth. It is also noteworthy that during his December 15 screening Palm documented that in addition to a fractured amalgam, Goodnow had cavities in two other teeth.

10. In the EMSA/DOC Dental Protocols, dental emergencies are defined as "[c]ellulitus, acute abscesses, uncontrolled or profuse hemorrhaging from the oral cavity, intra or extraoral swelling with or without fever or airway

at this stage, however, cannot decide the seriousness of Goodnow's condition for the purposes of his Eighth Amendment claim.

It is common knowledge that dental pain and pain in general can be of fleeting intensity. Goodnow's Complaint indicates that he was in enough pain for him to have complained on more than one occasion through formal channels, and for his mother to have contacted Superintendent Lanman between ten and fifteen times to inquire about her son's dental treatment. Although the nurse's report did classify Goodnow's condition as routine, she also considered it serious enough to refer him to Palm again for further evaluation and treatment. Goodnow's April 14, 2003 Affidavit states that he had and continues to have trouble eating, brushing his teeth and even breathing in the winter air. Moreover, he has presented an April 14, 2003 Affidavit from Dr. John Summerville, D.M.D, who examined Goodnow on April 4, 2003, in which Summerville acknowledges that tooth Number 30 has a "good bit of the crown fractured away" and states that "[t]emperature sensitivity, especially cold is consistent with a fractured tooth where the dentin is exposed." Based on the standard articulated in the cases above, Goodnow has presented genuine issues of material fact that a reasonable fact-finder could find establish a "sufficiently serious" condition.

**Deliberate Indifference**

■ Goodnow must also establish that EMSA acted with deliberate indifference toward his dental needs. In considering similar facts, the Second Circuit has chosen to distinguish between administrative delay and conduct that can be construed as a flat refusal of medical treatment for a condition that, if left untreated, is serious

and painful. *Harrison*, 219 F.3d at 136–138.

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance*, 143 F.3d at 703 (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847, 114 S.Ct. 1970; *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm."). " '[M]ere medical malpractice' is not tantamount to deliberate indifference, [but] certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance*, 143 F.3d 698, 703 (quoting *Hathaway*, 99 F.3d 550, 553).

■ Goodnow has adduced evidence to show that his cavities and broken tooth were left untreated by Palm and EMSA for at least seven months, during which he has expressed pain on a number of occasions. District courts within this circuit have ruled that a one-year delay in treating a cavity alone can evidence deliberate indifference on the part of prison officials. *See Dean v. Coughlin*, 623 F.Supp. 392, 402–403 (S.D.N.Y.1985); *see also Williams v. Scully*, 552 F.Supp. 431, 432 (S.D.N.Y. 1982) (finding a material issue of fact as to deliberate indifference after an inmate was made to wait five and a half months for

---

impingement, severe trauma, fractures of the maxilla or mandible, fractures of a vital natural tooth, severe pain or any life threatening dental situation."

refilling of a cavity, resulting in infection and loss of the tooth). And the Second Circuit has reversed a grant of summary judgment "where there is an underlying dispute as to whether legitimate medical claims were deliberately disregarded as punishment ... or for other invalid reasons." *Archer v. Dutcher*, 733 F.2d 14, 17 (2d Cir.1984); *see, e.g. Dean*, 623 F.Supp. at 403–404 ("Even if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates' needs if they fail to provide prescribed treatment."). It follows that refusal to treat a degenerative condition that tends to cause pain if left untreated or the imposition of a seriously unreasonable condition on such treatment can each constitute deliberate indifference on the part of prison officials. *Harrison*, 219 F.3d at 136–138.

EMSA points to its policy and its back-log as a reason for having failed to treat Goodnow. But it has not presented significant evidence indicating where Goodnow fit into its back-log or priority list of patients or even evidence establishing that a back-log actually existed during the time in question. Based on this omission and in light of the length of delay here alleged, a rational jury could find that EMSA was deliberately indifferent to Goodnow's serious medical needs.

In sum, the defendants have not foreclosed genuine issues of material fact as to whether Goodnow's condition was "sufficiently serious" and whether the delay in treating him was the result of deliberate indifference on the part of EMSA.

**Good Faith**

■ EMSA cites *Wyatt v. Cole*, 504 U.S. 158, 169, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), for the proposition that as a private party it is entitled to an affirmative defense based on good faith reliance on its contract with Vermont. To establish such a defense, EMSA must demonstrate that it relied in good faith upon a presumptively valid law and neither knew nor reasonably should have known that it was violating Goodnow's constitutional rights. *See id.* at 163–68, 112 S.Ct. 1827.

EMSA contends that Goodnow never presented any symptoms that would lead its personnel to believe that his dental condition required anything other than routine dental treatment. EMSA further argues that it relied on the contract and its policies in how it addressed this condition. But that argument misses the point. The real concern raised in this case is the fact that in seven months, EMSA never actually treated this dental problem, whether it was routine or not. Nothing in EMSA's policies or in its contract with Vermont would suggest the propriety of such a delay. Indeed, EMSA's Protocols provide that "[e]ach inmate requesting routine dental care will be placed on an appointment list" and then treated in line with his evaluation and request. Defs.' Ex. 3, Section V, *Clinical Dentistry*, (IV) Routine Dental Care. These Protocols require that dental emergencies, in which the inmate presents with "significant pain," a patient is to be treated "as soon as possible (within 24 hours)." *Id.*, Section II, *Scheduling of Patients*. A reasonable fact-finder could conclude that Goodnow's condition falls somewhere in that range and in any event that he required more immediate treatment than he was afforded. Significant case law in the sections above suggests that shorter delays than the one at issue have been considered a constitutional violation, even in the context of what began as routine dental concerns. On that basis, the Court concludes that a reasonable fact-finder could find a genuine issue of material fact as to whether EMSA's inaction constitutes good faith reliance.

**Conclusion**

WHEREFORE, for the reasons stated above, Defendants' motion for summary

judgment is **DENIED.** Dated at Burlington, Vermont this 23 day of May, 2003.