Donald **NELSON**, as Personal Representative of the Estate of Diane Nelson, deceased, Plaintiff,

v.

**PRISON HEALTH SERVICES, INC.,** American Service Group, Inc., Everett S. Rice, as Sheriff of Pinellas County, Florida, and Everett S. Rice, Individually, County of Pinellas, State of Florida, Diane Jackson, Clare Lu Safer, Sandra Spikes, Karyl Hayes, Dana Ostrov, Defendants.

No. 96–682–Civ–T–24 B.

United States District Court, M.D. Florida, Tampa Division.

Dec. 30, 1997.

Charles R. Scully, Law Offices of Charles R. Scully, St. Petersburg, FL, Sabato P. DeVito, Jr., Sabato DeVito, P.A., Springhill, FL, for Donald Nelson.

James Orrin Williams, Jr., Williams & Leininger, P.A., West Palm Beach, FL, for Prison Health Services, Inc., America Service Group, Inc., Sandra Spikes, Karyl Hayes and Dana Ostrov.

Robert A. Santa Lucia, Williams, Brasfield, Wertz, Fuller, Goldman, Freeman, & Lovell,

St. Petersburg, FL, for Everett S. Rice and Pinellas County.

Wallis M. Carson, Carson, Guemmer & Nicholson, Tampa, FL, James Orrin Williams, Jr., Williams & Leininger, P.A., West Palm Beach, FL, for Diane Jackson.

Charles D. Bavol, Bavol, Bush & Sisco, P.A., Tampa, FL, James Orrin Williams, Jr., Williams & Leininger, P.A., West Palm Beach, FL, for Clare Lu Safer.

### ORDER

BUCKLEW, District Judge.

Before the Court is the Motion to Dismiss filed by Defendant Everett S. Rice as Sheriff of Pinellas County, Defendant Everett S. Rice, individually, and Defendant Pinellas County (Doc. No. 37, part 1, filed May 22, 1997). Plaintiff filed a response in opposition on June 9, 1997 (Doc. No. 41). Also before the Court are Defendant Dana Ostrov's Motion for Summary Judgment (Doc. No. 52, filed September 30, 1997), Defendant Sandra Spikes' Motion for Summary Judgment (Doc. No. 53, filed September 30, 1997), Defendants Prison Health Services and America Services Group's Motion for Summary Judgment (Doc. No. 54, filed September 30, 1997), Defendant Karyl Hayes' Motion for Summary Judgment (Doc. No. 55, filed September 30, 1997) Defendant Clare Lu Safer's Motion for Summary Judgment (Doc. No. 60, filed September 30, 1997), and Defendant Diane Jackson's Motion for Summary Judgment (Doc. No. 61, filed September 30, 1997). Plaintiff filed a response in opposition to Defendant Ostrov's Motion for Summary Judgment (Doc. No. 77), a response in opposition to Defendant Safer's Motion for Summary Judgment (Doc. No. 72), a response in opposition to Defendant Jackson's Motion for Summary Judgment (Doc. No. 73), a response in opposition to Defendant Hayes, Motion for Summary Judgment (Doc. No. 74), a response in opposition to Defendant Hayes' Motion for Summary Judgment (Doc. No. 75), and a response in opposition to Defendants Prison Health Services, Inc. and American Services Group's Motion for Summary Judgment (Doc. No. 76) on October 21, 1997.

## I. BACKGROUND

In 1992, the Sheriff of Pinellas County entered into a contract with Prison Health Services, a subsidiary of American Service Group. (The Court will refer to the two collectively as "PHS.") Under this contract, PHS would provide medical services at the Pinellas County Jail. The Pinellas County Jail had been operating under this Court's oversight since 1975, pursuant to this Court's decision in *Davis v. Roberts*, No. 75–411–CIV–T–2. As part of this oversight, this Court appointed a monitor to review the conditions of the jail and to submit annual reports on the Jail's compliance with this Court's decision in *Davis*. The court-appointed monitor during 1993 and 1994 was Dr. Linda Smith.

In Dr. Smith's report of March 12, 1993, she noted pervasive problems with the Jail, especially with regards to its medical facilities and treatment: "The medical services continue to be the area generating the most complaints both through the Court and directly to the court monitor." (1993 Federal Court Monitor's Report, Doc. No. 78 at 5.) The most prevalent complaint, according to Dr. Smith, centered on the Jail's medical staff's failure to respond to requests for treatment in a timely manner, and Dr. Smith's investigation "confirm[-ed] the problem." *Id.* at 5.[1] A related problem involved the medical staff's failure to examine inmates who complained of medical problems. *See id.* at 6.

Dr. Smith's report for the following year revealed that medical treatment at the jail had, if anything, deteriorated:

The medical services are the most problematic area of concern under the consent decree. Most of the civil rights complaints filed with the courts are related to medical care both in the form of lawsuits and letters directly to the Federal Court Monitor. Despite a change in medical providers that occurred in November 1992, inmate medi-

---

1. Dr. Smith reports that two male inmates endured folliculitis for over six months before re- ceiving medical treatment. *See id.* at 4.

cal care continues to be fraught with serious problems, and the "new" medical providers really aren't new any longer and should have resolved many of these problems long ago. Complaints addressed by the Court monitor receive responses such as "the person fell through the cracks," "we made a mistake," "it won't happen again," etc. While it is reasonable to assume that when you are dealing in a human service capacity mistakes will occur occasionally, mistakes and problems in the medical care at the Pinellas County Jail are occurring too frequently especially given the serious liability issues that could arise from these mistakes.

(1994 Federal Court Monitor's Report, Doc. No. 78 at 7.) A particular concern for Dr. Smith was "the disparity in medical care for the females.... It seems that action is only taken when a crisis occurs." *Id.* at 8.[2] Dr. Smith warned that "the medical providers need to do some serious evaluation of the care provided to the females." *Id.* at 9. In particular, PHS needed to reevaluate "the current way in which 82's [requests for medical treatment] are handled by the medical staff." *Id.* at 10.

Perhaps because of Dr. Smith's investigations and reports, PHS did evince some concern about the manner in which its nursing staff was addressing the inmates' medical needs. In an August 3, 1993, memorandum to all nursing staff, Pat Terry, PHS Health Services Administrator, stated:

A positive response [to requests for medical treatment] only is acceptable! No matter how irritating you may think the inmate or his complaint is, please consider this: One year from now, you receive a subpoena to appear in court, and you find the following responses on the '82's'[:] "You have been hording your Nitro so you don't get any more" ... "Your 'mommy'

has called three times regarding your pain, tell her to stop calling and I will give you Tylenol." I actually found all of the above "82's" and I certainly do not want to go to court and explain these responses.

1994 Federal Court Monitor's Report App., Doc. No. 78. In closing, Terry pleaded with her staff, "I am asking that we all act like professionals in responding, no matter what kind of day you have had or how much the inmate has irritated you. *Deliberate indifference* will not be tolerated." *Id.* (emphasis added).

Similarly, in a July 16, 1993, memorandum to the nursing staff, Fran Bell stated that "[a]ll inmates must be *seen*.... Even if they are to be seen, or have been seen recently, you still need to 'see' in person, at least to inquire about the current problem." (1994 Federal Court Monitor's Report App., Doc. No. 78.) Apparently, however, these memoranda had little effect on the willingness of the Jail's medical staff to deal with treatment requests. Thus, in a December 14, 1993 memorandum, Fran Bell remonstrated: "The proper handling of 82's has been addressed several times. I have been advised that several nurses are *still* not doing proper assessments and referrals.... You must 'see' and evaluate inmates." (1994 Federal Court Monitor's Report App., Doc. No. 78.)

There is affidavit testimony on the part of female in-mates that suggests that the nursing staff at the Pinellas County Jail were not addressing their medical needs. Georgiana Woernle, for example, has testified that after suffering a miscarriage while in the Pinellas County Jail, "I had to wait six or seven hours before they sent me to the hospital even though I was bleeding profusely...." (Woernle Aff. ¶ 8.) Similarly, Adrienne Von Trager, a diabetic, has testified that "Nurse Diane Jackson told me, 'you don't need insu-

---

**2.** Dr. Smith described several instances in which the medical care provided to female inmates was shockingly substandard. In one, a "pregnant female who was instructed by an outside physician to stay off her feet because she had a cyst on her hip was placed in the psychiatric unit ... because she was close to a toilet. When she could not walk to the toilet, an officer asked for assistance from the medical staff. The nurse told the officer to give the inmate towels and a plastic bag in which to urinate...." (1994 Federal

Court Monitor's Report, Doc. No. 78 at 8.) In another instance, "[a] female came into the facility intoxicated ... and with a history of both alcohol and drug abuse as well as psychiatric problems.... [S]he was left unattended for five days by medical staff despite repeated calls by the detention deputy for medical assistance. This female did undergo alcohol withdrawal, was experiencing bizarre behavior, was unclothed with blood all over the cell, and was incoherent and urinating on the floor." *Id.* at 8–9.

lin until you go into a seizure.' " (Von Trager Aff. ¶ 4.)

Late in the evening of March 6, 1994, Diane Nelson entered the Pinellas County Jail as a pre-trial detainee. She had been arrested around 11:00 pm. Diane Nelson had suffered a heart attack the previous October and her doctor had prescribed Procardia XL and nitroglycerine to combat her cardiac problems. She had taken her medications at 6:00 pm that evening, but upon being arrested, she had been unable to locate them, and the deputy took her to jail without them. When Diane Nelson entered the Pinellas County Jail, she was taken to the screening nurse in the medical wing of the Female Security Center (FSC). The screening nurse that night was Karyl Hayes. On a document headed "Receiving Screening," Nurse Hayes noted that Diane Nelson had a heart condition that she had had a heart attack in October of 1993. (Hayes Dep. at 18.) Under medications she wrote: "Procardia XL, 60 mg PO, BID," meaning Procardia Extra–Long Acting (sustained release), 60 milligrams by mouth twice per day. *Id.* at 25. On a document titled "Master Problem List," Nurse Hayes wrote "Verify/cont." for verify and continue medications. *Id.* at 26. Nurse Hayes noted that Diane Nelson's blood pressure of 144/98 was "slightly elevated."

Nurse Spikes worked the first shift, succeeding Nurse Hayes at screening, from 7:00 am to 3:30 pm on March 7, 1994. (Spikes Dep. at 5–6.) On the morning of March 7, Diane Nelson asked Spikes when she would receive her medications. *Id.* at 7. Spikes then gave her three nitroglycerine in an envelope. *Id.* at 22. Spikes saw the unverified medications listed on Nelson's screening sheet but never called to verify them, because she considered it the floor nurse's duty to verify the medications. *Id.* at 9–10. The floor nurse in charge of administering medical treatment in the medical wing of the FSC during the first shift on March 7, 1994, was Dana Ostrov.

According to affidavit testimony from Diane Nelson's cell-mates, "[o]n the morning of

March 7, 1994, Diane Nelson was throwing up into a toilet for one to two hours." (Metcalf Aff. ¶ 3.) Having gone without her medication for over twelve hours, Diane Nelson was concerned about receiving it, and another cell-mate "[heard her] tell the nurses and the guards that she was worried about obtaining her medication." (Woernle Aff. ¶ 5.) In their absence, "[she] stayed in her bed the entire day of March 7, 1994, and she was sick throughout the day." (Metcalf Aff. ¶ 4.)

Clare Lu Safer succeeded Dana Ostrov, taking charge of the medical wing of the FSC for the second shift, from 3:00 pm to 11:00 pm. Upon arriving, Safer met Ostrov in the cafeteria, leaving no-one in charge of the FSC, a typical occurrence. (Safer Dep. at 8–9.) Ostrov told Safer that Diane Nelson had a history of cardiac problems and that her medications had been verified [3], although Ostrov did not tell Safer what those medications were. *Id.* at 7. At approximately 6:00 to 6:30 p.m. on March 7, 1994, Diane Nelson complained of chest pain, shortness of breath, and pain in her left arm and she asked Nurse Safer for her medication. (Von Trager Aff. ¶ 5; Woernle Aff. ¶ 6.)

Safer did not do an EKG, as required in the Prison Health Services' 1993 Treatment Protocol dealing with "chest pain." (Doc. No. 78.) Nor did she notify the physician on call and prepare to transfer Nelson to a hospital emergency room, as required according to the "Chest Pain" protocol when a patient has a prior history of heart disease. *Id.* Safer remembers Nelson describing the medications but not connecting the Procardia XL with her heart disease. "[T]o me, Procardia was for hypertension and nitroglycerin was for any possible angina." (Safer Dep. at 32, 37.) This misconception may have stemmed from the fact that Safer could not find Diane Nelson's chart. Lacking the chart, Safer called Nelson's pharmacist to verify her medications. The Pharmacist told her that she had already verified the medications three times. *Id.* at 28. Safer did not ask her to verify them again "[b]ecause at that point I didn't have the chart, and though

---

**3.** It is disputed whether Ostrov attempted to verify the medications but failed because the pharmacy computer was inoperative.

for sure that it's written on the chart, so I didn't want to put [the pharmacist] through it, if it was already recorded." *Id.* at 28–29. After the chart was found on a refrigerator, *id.* at 16, Safer noticed that there was no indication on it that the medications had been verified, yet Safer did not call the pharmacist back to verify them: "[i]t wasn't an emergency, so I didn't know if [the supervisor] would want me to spend all that time when I had other things to do." *Id.* at 30.

If either Ostrov or Safer had succeeded in verifying Diane Nelson's Procardia XL they might have ordered it from an outside pharmacy, which delivered to the jail once per day. Moreover, although the Jail did not keep a supply of Procardia XL on hand because it was too expensive, (Safer Dep. at 57–58), it did keep Procardia, which could be converted into Procardia XL. (Safer Dep. at 31.) If the medications had been verified, Safer "probably" would have called the Doctor to have the Procardia converted into Procardia XL. *Id.* at 45.

"Nurse Diane Jackson came on duty to relieve Nurse Clare Lu Safer at approximately 11:30 pm on March 7, 1994. At this time Diane Nelson's skin was a pasty grey, she was crying, and scared." (Von Trager Aff. ¶ 6.) According to Jackson, Safer told her "that [Diane Nelson] had been stating that she was having chest pains, and upon examination that [Safer] did not find, shall we say, factuality [sic] of them." (Jackson Dep. at 8.) Although Nurse Safer has said that she found Diane Nelson's chart before Nurse Jackson arrived, Nurse Jackson has testified that she did not have the chart on hand when she took over and she hazards that it was in the other wing of the Jail. (Jackson Dep. at 9.)

Diane Jackson was an LPN, not an RN. (Jackson Dep. at 5.) According to in-mates, "Nurse Jackson always seemed to be eating and many times would be eating in the nurse's station. She would sometimes be snacking while on rounds." (Von Trager Aff. ¶ 15.) Jackson was known to have—and has admitted to having—"joked" that "[w]e save money because we skip the ambulance and bring them right to the morgue." (Jackson Dep. at 63.)

At 2:16 am, "Diane Nelson complained to Nurse Diane Jackson that she was experiencing chest pains and difficulty breathing." (Von Trager Aff. ¶ 7.) After a cursory exam, Jackson allegedly told her, "if there was something really wrong with you, your doctor would have called by now." *Id.* Still, Jackson gave Diane Nelson three nitroglycerine tablets and told her to self-medicate. (Jackson Dep. at 11–12.) Although this was contrary to PHS protocols, "it was [Jackson's] understanding that if some other nurse had initiated to give nitro, then we could follow it." (Jackson Dep. at 12–13.) Like Safer, Jackson did not do an EKG, as required in the Prison Health Services' 1993 Treatment Protocol dealing with "chest pain." (Doc. No. 78.) Nor did she notify the physician on call and prepare to transfer Nelson to a hospital emergency room, as required according to the "Chest Pain" protocol when a patient has a prior history of heart disease. *Id.*

After Jackson left, Diane Nelson's cellmates recall that Nelson's condition continued to worsen, with Nelson "sweating profusely." (Woernle Aff. ¶ 7.) These cellmates "attempt[-ed] to get medical attention for Diane Nelson by banging on the cell door," (Von Trager Aff. ¶ 10), and by "calling for a nurse to help Diane Nelson who was very ill." (Metcalf Aff. ¶ 5.) "[They] attempted to get a nurse for a good two hours." *Id.*

At 3:18 am, while Diane Jackson was at breakfast, roughly three blocks away from the FSC, she was notified by the officer that Diane Nelson was having chest pains. She did not examine her. (Jackson Dep. at 17–19.) "I did not feel that it was an emergency; or if it was, the officers would have notified me." *Id.* at 50. This failure to examine was common, according to Jackson: "[A] lot of times we refer to the officers, because they have had first response, and if there's an acute problem, they let us know if it's an acute problem." *Id.* at 20.

At 4:00 am, when Jackson returned from breakfast, an officer notified her that "she's now having chest pains going down her arm. I said I'll see her as soon as I do the diabetics." (Jackson Dep. at 19.) In explaining her decision to administer insulin to diabetic in-mates who were not in exigent condition rather than to see to Diane Nelson, Jackson

has offered, "it did not appear to be an acute problem at the time." *Id.* at 20. When asked whether chest pains in conjunction with shooting pains down the left arm indicated a cardiac emergency,[4] Jackson has further stated that "within itself, it could be [but] knowing that a person may be faking that, and they all know about pains going down the arm, no, sir." *Id.* at 47.

At approximately 4:25 am, Diane Jackson called the officers to bring Diane Nelson to the infirmary. (Jackson Dep. at 23.) Von Trager has testified that she helped the officer to bring Diane Nelson to the infirmary, and that Nelson collapsed upon arrival (Von Trager Aff. ¶¶ 8, 9.) According to Von Trager, Jackson remarked, "here we go again ... I am really getting tired of this phoney bullshit—I don't have time for it." *Id.* ¶ 8. Jackson herself admits having said, "Stop the theatrics and get up on the chair." (Jackson Dep. at 24.)

Jackson then waived ammonia under Diane Nelson's nose in case Nelson was "faking an injury or something." (Jackson Dep. at 26.) It was then that Jackson noticed that Nelson had become incontinent and was uttering a wheezing, "post-dictal" sound. *Id.* at 27. Also, Nelson's "face was slightly cyanotic." *Id.* at 28. From this, Jackson concluded that Nelson was having a seizure, not a heart attack. *Id.* at 27. After failing to discern any blood pressure whatsoever, Jackson called 911. *Id.* at 30. When Nelson ceased breathing, Jackson initiated CPR. *Id.* at 31–32. Jackson did not discover that Nelson had suffered a previous heart attack until filling out the forms for the emergency response team. *Id.* at 39. Jackson never felt the need to call Dr. Schedonic. *Id.* at 59. Indeed, in her deposition, Jackson could not recall ever having called Dr. Schedonic with regards to an inmate's need for emergency treatment. *Id.* at 63.

Diane Nelson died of acute myocardial infarction at 4:06 am on March 9, 1994. (Certificate of Death.) Dana Ostrov was dismissed following this incident. (Defs.' Answers Pl.'s Interrogs.) Diane Jackson and Sandra Spikes were placed on probation. *Id.* Clare Lu Safer resigned to accept a teaching position at a local community college. (Safer Dep. at 6.)

On March 8, 1996, Donald Nelson, as personal representative of the Estate of Diane Nelson, initiated this action in the Circuit Court for the sixth Judicial Circuit in and for Pinellas County. In a sprawling 125 page complaint, Plaintiff designated thirty-five counts. Twenty-two remain for consideration here.[5] These twenty-two counts include state law claims for medical malpractice against PHS (Count I), ASG (Count II), Sheriff Rice in his official capacity (Count III), the County (Count IV), Diane Jackson (Count V), Clare Lu Safer (Count VI), Sandra Spikes (Count VII), Karyl Hayes (Count VIII), and Dana Ostrov (Count IX). The also include state law claims for negligence against Sheriff Rice in his official capacity (Count XIV), Sheriff Rice individually (Count XV), and the County (Count XVI). They further include claims brought pursuant to 42 U.S.C. § 1983 against PHS (Count XXIV), ASG (Count XXV), Sheriff Rice in his official capacity (Count XXVI), Sheriff Rice in his individual capacity (Count XXVII), the County (Count XXVIII), Diane Jackson (Count XXIX), Clare Lu Safer (Count XXX), Sandra Spikes (Count XXXI), Karyl Hayes (Count XXXII), and Dana Ostrov (Count XXXIII). On April 8, 1996, this case was removed from state court to this Court on the basis of this Court's jurisdiction over the section 1983 claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and its supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## II. DISCUSSION

### A. Standards of Review

Defendant Rice in his official capacity, Defendant Rice, individually, and Defendant Pinellas County have filed a motion to dismiss the medical malpractice claims (Counts II and III) and the section 1983 claims (Counts XXVI, XXVII, and XXVIII) against them. Defendants Ostrov, Safer, Jackson, Hayes,

---

4. In an April 29, 1993 Memorandum, Dr. Schedonic stated that the classic symptoms of a heart attack include "pale and ashen" complexion and "pain radiating to the left arm." (Doc. No. 78.)

5. In a simultaneous order, the Court strikes Counts XI, XII, XIII, XVII, XVIII, XIX, XX, XXI, XXIII, and XXXV.

Spikes, and PHS have filed motions for final summary judgment in their favor as to all of the claims against them.

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed for failure to state a cause of action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bank v. Pitt,* 928 F.2d 1108, 1111–12 (11th Cir.1991) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Summary judgment, which generally occurs after discovery, demands more of the plaintiff/non-movant. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.

*Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989); *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *See Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir.1988).

### B. The Civil Rights Claims

■ In counts XXIV, XXV, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, and XXXIII of the Complaint, Plaintiff alleges that the Defendants violated the Civil Rights Act of 1871, 42 U.S.C. § 1983.[6] There are two components to a valid section 1983 action: first, a showing that the injury in question was inflicted "under color of state law" (that is, a showing that those who inflicted it—i.e., the defendants—were "state actors"); and second, a showing that the injury involved a deprivation of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *See, e.g., Monroe v. Pape,* 365 U.S. 167, 173–74, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

#### 1. Qualified Immunity

■ The Sheriff argues that the doctrine of qualified immunity precludes his individual liability for civil damages. The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages as long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Adams v. Poag,* 61 F.3d 1537, 1542 (11th Cir.1995).[7] Entitlement to qualified immunity is a question of law to be resolved by the district court prior to trial.

---

**6.** Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Consti-

tution and laws, shall be liable to the party injured in an action at law. Suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983 (1994).

**7.** Although the doctrine of "qualified immunity" has been equated with the constitutional require-

*See Howell v. Evans,* 922 F.2d 712 (11th Cir.), *vacated pursuant to settlement,* 931 F.2d 711 (11th Cir.1991). The first question then is whether the Sheriff was exercising his discretionary authority with regards to the provision of medical treatment to inmates at the Pinellas County Jail. Case law makes it plain that the decision to bestow or deny medical services to pre-trial detainees is a discretionary function for purposes of the qualified immunity analysis. *See, e.g., Pfannstiel v. City of Marion,* 918 F.2d 1178 (5th Cir.1990).

The next question is whether the right at stake was "clearly established" at the time of Diane Nelson's incarceration at the Pinellas County Jail. Although the Supreme Court has not specified which courts' decisions may "clearly establish" a right, *see Benson v. Allphin,* 786 F.2d 268 (7th Cir.1986), there is precedent in this Circuit for the proposition that the right to receive to medical treatment has been "clearly established" for some time. *See Harris v. Coweta County,* 21 F.3d 388, 393 (11th Cir.1994) ("[In 1990], it was clearly established that knowledge of the need for medical care and intentional refusal to provide the care constituted deliberate indifference."); *Howell,* 922 F.2d at 720 ("[T]he law was clearly established [in 1985] that if a reasonable official would have known that certain treatment was necessary, the refusal to provide or a delay in providing that treatment would constitute deliberate indifference and violate [the prisoner's] eighth amendment rights.").[8]

As this precedent suggests, however, an official can have violated this clearly established right, only if he "had knowledge of the need for medical care." *See Harris,* 21 F.3d

at 393; *see also Howell,* 922 F.2d at 720 (holding that refusal to provide medical treatment or delay in doing so violated clearly established right only if "a reasonable official would have known that certain treatment was necessary"). Thus, it is only when the sheriff is personally involved in the decision to withhold medical treatment that he or she is stripped of qualified immunity. *See Ancata,* 769 F.2d at 706. Plaintiff has failed to allege facts tending to show that the Sheriff knew or should have known of Diane Nelson's need for her medications or her subsequent need for medical treatment. Thus, the Sheriff in his individual capacity is entitled to qualified immunity from civil damages arising out of the death of Diane Nelson.

### 2. The Nurses

■ The Nurses argue that they, like the Sheriff, are entitled to raise a defense of qualified immunity from liability for civil damages arising out of the death of Diane Nelson. Although the Eleventh Circuit has never explicitly held that a private company that provides medical services for a state correctional institution or its employees may raise a defense of qualified immunity to a section 1983 action, this Circuit extended qualified immunity to employees of a private company that provided medical services to a state correctional institution in *Adams v. Poag,* 61 F.3d 1537 (11th Cir.1995) and in *Leeks v. Cunningham,* 997 F.2d 1330, 1333 n. 3 (11th Cir.1993) (inferring that if entity is a "state actor" for purposes of section 1983 liability then it must be an "official" for purposes of raising qualified immunity defense).

---

ment of "clear warning" or "notice," *see United States v. Lanier,* 520 U.S. 259, ——, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997), unlike that doctrine qualified immunity does not flow from any constitutional provision. Nor does the doctrine derive from section 1983, which on its face admits of no immunities. Rather, the doctrine of qualified immunity represents a judicial policy judgment, and like, most such policy judgments, it is marked by "ad hoc decisionmaking, conflicting rationales, and a high degree of doctrinal manipulation." David Rudovksy, *The Qualified Immunity Doctrine in the Supreme Court,* 138 U.Pa.L.Rev. 23, 36 (1989).

8. It is true that "[t]he eighth amendment ... applies only to confinement that occurs subse-

quent to and as a consequence of a person's lawful conviction of a crime," and that "[c]onditions of confinement imposed prior to conviction are limited ... by the due process clause of the fourteenth amendment." *Hamm v. DeKalb County,* 774 F.2d 1567, 1572 (11th Cir.1985) (citing *Bell v. Wolfish,* 441 U.S. 520, 520 & n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Nonetheless, the Eleventh Circuit has held that, "in regard to providing pretrial detainees with ... medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm,* 774 F.2d at 1574; *see also Tittle v. Jefferson County,* 10 F.3d 1535, 1539 (11th Cir.1994) (en banc).

If these instances are in fact holdings, their viability is called into question, by the United States Supreme Court's recent decision in *Richardson v. McKnight*, — U.S. ——, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). In *Richardson*, the Supreme Court held that prison guards, who were employees of a private prison management firm, were not entitled to raise a defense of qualified immunity to a section 1983 action on the part of a prisoner. *Id.* 117 S.Ct. at 2102. The Court cited its decision in *Wyatt v. Cole*, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), for the proposition that the decision as to whether a private defendant enjoyed qualified immunity was to be guided by history and by the "special policy concerns involved in suing government officials." *Richardson*, 117 S.Ct. at 2103 (citing *Wyatt*, 504 U.S. at 163, 167).

Looking first to the historical underpinnings of the qualified immunity doctrine, the Court noted that "[h]istory does not reveal a 'firmly rooted' tradition of immunity applicable to privately employed prison guards." *Richardson*, 117 S.Ct. at 2104. Indeed, history showed the reverse: "[C]orrectional functions have never been exclusively public. Private individuals operated local jails in the 18th century, and private contractors were heavily involved in prison management in the 19th century." *Id.* (citations omitted). Turning next to the policy concerns that justify the qualified immunity doctrine, the Court concluded that they do not apply to private entities involved in prison operations or prison management. In particular, because such entities are subject to market pressure, they are unlikely to succumb to "unwarranted timidity" out of fear of liability. *See id.* at 2106 ("[M]arketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'non-arduous' employee job performance."). The Court concluded that the second policy concern justifying the qualified immunity defense—"the ... need 'to ensure that talented candidates' are 'not deterred by the threat of damages suit from entering public service'"—was equally inapposite with regards to private

entities involved in prison operations or management. *Id.* at 2107 (quoting *Wyatt*, 504 U.S. at 167).

The Court's holding in *Richardson* explicitly and self-consciously extends to factual predicates like the one at hand: "[The decision applies to situations] in which a private firm, systematically organized to assume a major lengthy administrative task ... with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Richardson*, 117 S.Ct. at 2108. The provision of medical treatment to an entire institution like the Pinellas County Jail, with little or no supervision by the Sheriff, is clearly the sort of "major lengthy administrative task" contemplated by the Court in *Richardson*. *See id.; see also Amos v. Maryland Dept. of Pub. Safety & Correctional Servs.*, 126 F.3d 589, 611–12 (4th Cir.1997) (interpreting *Richardson* to mean that private prison medical care providers may not raise defense of qualified immunity); *Zimmer v. Osborne*, No. 95–3306–GTV, 1997 WL 457705, at *2 n. 4 (D.Kan.1997) (same).

Moreover, the analysis undertaken by the *Richardson* Court supports the conclusion that private entities providing medical care or treatment to inmates may not raise a defense of qualified immunity. Like the private operation or management of the entire prison, private provision of medical care or treatment to inmates appears to have been historically commonplace and bare of the immunity traditionally afforded public functions. *See* Samuel Jan Brakel, *Considering Behavioral and Biomedical Research on Detainees in the Mental Health Unit of an Urban Mega–Jail*, 22 New Eng.J. on Crim. & Civ. Confinement 1, 3 (1996) ("[T]he discrete provision by private vendors of a number of essential prison services such as ... medical/dental care ... is a longstanding practice."). Similarly, the same marketplace pressures that guard against a private prison guard's becoming overly timid in his or her duties, also guard against a private medical provider's becoming overly timid in his or her treatment of inmates. *See* Martin E. Gold, *The Privatization of Prisons*, 28 Urban Law. 359, 380–81 (1996).[9] The Court thus

---

**9.** "Because the operator must pay for [liability] insurance and deductibles, to avoid greater premium costs and reduced corporate profits, the

concludes that the Supreme Court's holding and its analysis in *Richardson* precludes these Defendants from raising a qualified immunity defense.

■ *Richardson* leaves unaltered, however, the case law holding that a private medical provider is a "state actor" for the purposes of section 1983. *See West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding that private doctor supplying medical services to prison is state actor); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir.1985) (holding the private organization supplying health services for prisoners is state actor); *see also Dolihite v. Maughon,* 74 F.3d 1027 (11th Cir.) (holding that private psychologist who provided care at state adolescent home under contract with state was state actor), *cert. denied,* — U.S. ——, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996); *Conner v. Donnelly,* 42 F.3d 220 (4th Cir. 1994) (holding that private physician who treated inmate on referral of prison physician acted under color of state law when he was deliberately indifferent to inmate's serious medical needs); Gold, *supra,* at 379–80 ("Under 42 U.S.C. § 1983, the operator is an extension of the government, and its actions remain 'state actions.'"). Thus, although these Defendants may not raise a qualified immunity defense, they are still state actors for purposes of section 1983.

■ The question then is whether the Plaintiff has come forward with sufficient evidence tending to show that each of these Defendants "[knew] that certain treatment was necessary" for Diane Nelson, but refused to provide that treatment, or so delayed in providing it, as to have been "deliberately indifferent" to her serious need for medical care. The resolution of this question involves: first, ascertaining whether Diane Nelson had a serious medical need; and second, whether these Defendants were deliberately indifferent to that need. *See Adams,* 61 F.3d at 1542; *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989). Because none of the Defendants dispute the fact that Diane Nelson had a serious medical need, their potential liability under section 1983 pivots

solely on whether they were deliberately indifferent to that need.

Plaintiff has put forward considerable evidence that at least three of the nurses, Defendant Ostrov, Defendant Safer and Defendant Jackson, were deliberately indifferent to Diane Nelson's serious medical need. Defendant Safer's testimony suggests that Defendant Ostrov may have succeeded in verifying Diane Nelson's Procardia XL prescription, but that she never ordered the drug or even marked on Diane Nelson's chart that it had been verified. Indeed, the evidence suggests that Ostrov left that chart, with its essential information as to Nelson's condition, on a refrigerator. Like Ostrov, Safer knew that Diane Nelson had a history of cardiac problems, and that she was not receiving the Procardia XL prescribed for her. Yet Safer refused to verify the Procardia XL so that it could be ordered or converted from the Jail's supply of Procardia.

Because neither Ostrov nor Safer verified and ordered the Procardia XL, Diane Nelson went over thirty-six hours without the medication that she was supposed to take every twelve hours. Delays such as this may in and of themselves amount to "deliberate indifference." *See Solomon v. English,* No. 92–C–1597, 1994 WL 61794, at *2 (N.D.Ill. Feb.24, 1994) (holding that delay in providing inmate with heart medication amounted to deliberate indifference); *Weeks v. Benton,* 649 F.Supp. 1297, 1302–03 (S.D.Ala.1986) (concluding that there was evidence of deliberate indifference in inmate's not being provided with heart medication and defendant's ignoring pleas for treatment).

In this case, the delays in procuring Diane Nelson's Procardia XL were compounded by the shoddy treatment afforded her. Both Safer and Jackson responded to Nelson's complaints of chest pain by handing her nitroglycerine and telling her to self-medicate. PHS's own protocol suggests that the appropriate response would have been to give Nelson an EKG test and—because Nelson had a history of cardiac problems—call the physician on duty. Merely plying Nelson with

operator will be forced to be careful about training and operating policies.... Operations that are in compliance with or exceed the require-

ments of the Constitution ... will help immunize the facility from liability." Gold, *supra,* at 380–81.

nitroglycerine when she was suffering recurrent chest pain is treatment so cursory as to amount to deliberate indifference. *See Mandel,* 888 F.2d at 789 ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."); *Ancata,* 769 F.2d at 704 (same); *see also West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978) (holding that provision of aspirin for post-operative pain amounted to deliberate indifference).

The "treatment" provided by Jackson appears especially egregious. Jackson's deposition testimony suggests a positive antipathy toward her patients. When, at 3:18 am on March 8, 1994, Diane Nelson made her third complaint of chest pains, Diane Jackson chose to remain in the dining hall in order to finish her breakfast. When she returned from breakfast at 4:00 am to find that Nelson was complaining of chest pains radiating down her left arm, Diane Jackson again delayed seeing her, suspecting that the pains might be a ruse. When Nelson collapsed in the door way of the infirmary half an hour later, Jackson told her to "stop the theatrics" and waved ammonia under her nose, again in case Nelson was "faking." Ignoring PHS protocols, Jackson never called a physician, delayed examining Nelson until her fourth complaint of chest pains, and did not call for an emergency response team until Nelson—an individual with a history of cardiac illness who had been without her medication for over thirty-six hours—had stopped breathing.

Jackson's dogged refusal to provide medical care was clearly tantamount to deliberate indifference. *See Harris,* 21 F.3d at 393 ("A few hours' delay in receiving medical care for emergency needs . . . may constitute deliberate indifference"); *see also Wellman v. Faulkner,* 715 F.2d 269, 273 (7th Cir.1983) (concluding that failure to examine inmate complaining of chest pains and failure to send him to hospital was one of number of instances of deliberate indifference).

█ From the facts as alleged and as developed in affidavits, and deposition testimony, it does not appear that either Defendant Hayes or Defendant Spikes, who were screening nurses, were "deliberately indifferent" so as to be liable under section 1983.

Nurse Hayes apparently recorded an accurate version of Diane Nelson's medical condition, although she noted high enough blood pressure to require treatment for hypertension. There is evidence that Nurse Hayes could not have verified the Procardia XL prescription the night of March 6, 1996, because Nelson's pharmacy was closed. Nurse Spikes may have violated PHS protocol in giving Nelson three nitroglycerine and allowing her to self-medicate, but this act does not rise to the level of indifference demonstrated by Ostrov, Safer and Jackson.

Thus, Plaintiff has put forward sufficient evidence to establish the liability of Defendant Ostrov, Defendant Safer, and Defendant Jackson, under section 1983, but has failed to put forward sufficient evidence to establish the liability of Defendant Hayes or Defendant Spikes under section 1983.

### 3. The County's Liability Under Section 1983

█ Although the Nurses were technically employees of PHS, the County may not shield itself behind that relation in order to escape section 1983 liability. *See generally* Gold, *supra,* at 379–80 ("[I]t is essential to understand that the government will remain liable for violations of the constitutional rights of the prisoners, even if the private company is responsible for the acts or omissions."). In determining whether a county or municipality may be liable under section 1983 for constitutional violations on the part of individual state actors, the broad contours of respondeat superior liability do not apply. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, the Supreme Court has held that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Thus, municipalities may be held liable under section 1983 only for the execution of a governmental policy or custom. *Monell,* 436 U.S. at 694; *see McKusick v. City of Melbourne,* 96 F.3d 478, 483 (11th

Cir.1996) ("The presence of municipal policy or custom is essential....").

Because "[a] county must be held accountable for more than its officially-codified policies." *Van Ooteghem v. Gray*, 628 F.2d 488, 494 (5th Cir.1980), *vacated on other grounds*, 640 F.2d 12 (5th Cir.1981), a county may also be liable for "customs and practices having the force of law." *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir.1989). In order to prove the county's liability based on custom, "[the Plaintiff] must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991) (citations omitted). Such custom must be shown to have been so "longstanding and widespread" that it is considered to have been "authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.*

Plaintiff has alleged and even presented evidence of precisely this sort of "widespread" and "longstanding" failure to provide adequate medical treatment. From 1975 forward, the Pinellas County Jail operated under the oversight of this Court, pursuant to which a Court Appointed Monitor reported on the conditions of in-mates at the Jail. In both 1993 and 1994, this Monitor emphasized in her reports pervasive and deep-seated failures in providing medical care to the inmates of the Jail. These reports address in particular the medical staff's unwillingness to respond to inmates' requests for treatment, especially requests by female inmates. This particular indictment of the medical care at the Jail is corroborated by PHS's own memoranda. Indeed, PHS's Director of Nursing herself characterized the attitude of the nurses at the jail as one of "deliberate indifference." Accordingly, the Court concludes that Plaintiff has alleged sufficient facts, and proffered sufficient evidence, to establish a "longstanding and widespread" violation of inmates' constitutional right to medical treatment, and, thus, to establish the County's potential liability under section 1983.

### 4. Prison Health Services Liability Under Section 1983

The Eleventh Circuit has held that "when the state contracts out its medical care of inmates, the obligations of the eighth amendment attach to the person with whom the state contracts." *Howell v. Evans*, 922 F.2d at 724. "Thus, a private corporation under contract to provide medical services for prisoners can be a person acting under color of state law for the purposes of section 1983." *Id.* Like a county or a municipality, however, a private corporation like Prison Health Services can not be held liable on the basis of the doctrine of respondeat superior. *See id.* at 724 & n. 12. Thus, the test for PHS's liability under section 1983 mirrors that of the test for the County: that is, "the plaintiff would need to show either that the company was directly involved in the alleged violation or that a policy or custom of the corporation led to the violation." *Id.* at 724 (citing *Ort v. Pitchback*, 786 F.2d 1105, 1107 (11th Cir.1986)).

The same evidence of "custom" upon which the Court has concluded that the County's section 1983 liability may be predicated also forms the basis for PHS's liability under section 1983. Indeed, Dr. Smith's reports indict PHS as thoroughly, if not more so, than they do the County, as do PHS's own internal memoranda. The Court therefore concludes that the Plaintiff has proffered sufficient evidence to establish PHS's liability under section 1983.

### C. The State Law Claims

Pursuant to 28 U.S.C. § 1367, Plaintiff also brings pendent state law claims of negligence and medical malpractice against the Defendants. Although the Sheriff may not raise a qualified immunity defense against these pendent state law claims, *see Davis v. Monroe County Bd. of Ed.*, 120 F.3d 1390, 1409 (11th Cir.1997) (Black, J., concurring) ("[Q]ualified immunity does not shield officials from liability grounded on state law."); *Kelly v. Curtis*, 21 F.3d 1544, 1556 (11th Cir.1994) (holding that qualified immunity may entitle defendant to summary judgment as to federal claims but not as to state law claims); *see also Morin v. Caire*, 77 F.3d

116 (5th Cir.1996) ("[Qualified immunity] does not apply to the decision to deny plaintiffs' state law claims[.]"), the Sheriff is still immune from individual liability for either tort based on Fla.Stat.Ch. 768.28(9)(a), which has been interpreted by the Florida Supreme Court "to extend the veil of sovereign immunity to ... specified governmental employees when they are acting within the scope of their employment, with the employing agency alone remaining liable up to the limits provided by statute." *McGhee v. Volusia County,* 679 So.2d 729, 733 (Fla.1996). In his individual capacity, a county sheriff is a covered employee for purposes of chapter 768.28(9)(a), *see Hutchinson v. Miller,* 548 So.2d 883, 886 (Fla.Ct.App.1989) (discussing distinction between liability of sheriff in individual capacity and in official capacity for purposes of chapter 768.28(9)(a)), but in his official capacity a county sheriff represents a "state agency" or "political subdivision" under chapter 768.28(1). *See id.; Beard v. Hambrick,* 396 So.2d 708, 711 (Fla.1981). Because Plaintiff has failed to allege that the Sheriff's actions (or omissions) "are so extreme" as to be outside the scope of his employment, the state law claims based on them may be brought only against the Sheriff in his official capacity and against the County. *See McGhee,* 679 So.2d at 733; *see also Beard,* 396 So.2d at 711 (holding that both county and sheriff are "political subdivisions" of state for purposes of chapter 768.28).

Because the Sheriff, in his official capacity, and the County are "political subdivisions" of the state for purposes of Florida's limited waiver of sovereign immunity statute, they may be liable for "the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision would be liable to the claimant." Fla.Stat.Ch. 768.28(1).

### 1. Medical Malpractice

In Chapter 766 of the Florida Statutes, the Florida legislature has codified the tort of medical malpractice. Under chapter 766, a "health care provider" may be liable for the death or personal injury of a person, if that death or injury resulted from the health care provider's negligence. Fla. Stat.Ch. 766.102(1). Neither the Sheriff in his official capacity nor the County are "health care providers" under section 768.50(2)(b), and so they may not be held liable for medical malpractice under chapter 766. It is not disputed, however, that PHS and the Nurses are "health care providers" for purposes of the statute, and so the question is whether Plaintiff has come forward with sufficient "evidence that [their] alleged actions ... represented a breach of the prevailing professional standard of care." Fla. Stat.Ch. 766.102(1). Florida courts have interpreted the "prevailing professional standard of care" to be the "level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." *Auster v. Strax Breast Cancer Institute,* 649 So.2d 883 (Fla.App.1995).

Having put forward sufficient evidence that the actions of PHS, Nurses Safer, Ostrov, and Jackson amounted to "reckless indifference" for purposes of the section 1983 claims, Plaintiff has manifestly put forward sufficient evidence tending to show that their actions represented "a breach of the prevailing standard of care." Moreover, Plaintiff has submitted the expert affidavit of a Deborah Borelli, R.N., who has opined that the treatment provided by these Defendants fell below the acceptable standard of care insofar as they failed to recognize the significance of Diane Nelson's complaints of chest pain, failed to verify her prescription medicines in a timely manner, failed to obtain and administer those medicines in a timely manner, improperly administered cardiac medications, failed to monitor and assess Nelson properly, and failed to obtain appropriate care for her once her condition seriously deteriorated. (Borelli Aff. at 3.) Plaintiff has also put forward evidence that Defendants Safer, Jackson, and Ostrov violated PHS's own procedure and protocols. Thus, Plaintiff has put forward sufficient evidence for his medical malpractice claim to withstand summary judgment as against Defendants Ostrov, Safer, and Jackson.

█ Additionally, Plaintiff has put forward sufficient evidence that Defendants Hayes and Spikes also departed from the "level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." *Auster*, 649 So.2d 883. Specifically, Plaintiff has pointed to Defendant Spikes' deposition testimony that she gave Nelson three nitroglycerine and told Nelson to self-medicate in violation of PHS policy and procedure requiring a nurse to "[o]bserve inmate taking medication." Spikes further failed to record her having given Nelson these medications. Similarly, when Diane Nelson arrived at Pinellas County Jail, Defendant Hayes recorded that her blood pressure was 144/98. PHS's own Nursing Protocol Manual describes such a high blood pressure as indicative of hypertension. The protocol goes on to require that the blood pressure be taken in both arms, sitting and standing, which Hayes did not do or request be done. Thus, while the actions (or omissions) of Defendants Spikes and Hayes did not constitute "reckless indifference" for purposes of section 1983, there is sufficient evidence that they departed from the prevailing standard of care to survive summary judgment. It is a question of fact whether these Defendants Spikes and Hayes' acts or omission were actually and proximately the cause of Diane Nelson's death.

Finally, under the doctrine of respondeat superior, PHS is liable for any breach of the prevailing professional standard of care on the part of its employees within the scope of their employment. *See Weinstock v. Groth*, 629 So.2d 835, 838 (Fla.1993); *Kelley v. Rice*, 670 So.2d 1094, 1097 (Fla.Ct.App.1996). It is not disputed that any actions or omissions on the part of the nurses that breached the prevailing professional standard of care with regards to their treatment of Diane Nelson occurred within the scope of their employment with PHS. Thus, insofar as the issue of their liability for medical malpractice is for the trier of fact, so too is the potential vicarious liability of PHS.

## 2. Negligence

The County and the Sheriff do not move to dismiss the negligence claims against them,

only to strike those claims if the medical malpractice claims are not dismissed. Because the Court holds that neither the County nor the Sheriff in his Official Capacity may be held liable for medical malpractice, the Court need not address the negligence claims against them.

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendants Pinellas County and Everett S. Rice's Motion to Dismiss (Doc. No. 37, part 1) is DENIED IN PART and GRANTED IN PART insofar as the motion is GRANTED as to Defendant Rice in his individual capacity (Counts XV and XXVII), and as to the medical malpractice claims against Defendant Rice in his official capacity as Sheriff (Count III) and against Pinellas County (Count IV), but the motion is DENIED as to the section 1983 claims against the Sheriff in his official capacity (Count XXVI) and against Pinellas County (Count XXVIII).

(2) Defendant Dana Ostrov's Motion for Summary Judgment (Doc. No. 52) is DENIED;

(3) Defendant Sandra Spikes' Motion for Summary Judgment (Doc. No. 53) is DENIED IN PART and GRANTED IN PART insofar as summary judgment in her favor is granted as to the section 1983 claim (Count XXXI) but not as to medical malpractice claim (Count VII);

(4) Defendants Prison Health Services and America Services Group's Motion for Summary Judgment (Doc. No. 54) is DENIED;

(5) Defendant Karyl Hayes' Motion for Summary Judgment (Doc. No. 55) is DENIED IN PART and GRANTED IN PART insofar as summary judgment in her favor is granted as to the section 1983 claim (Count XXXII) but not as to the medical malpractice claim (Count VIII);

(6) Defendant Clare Lu Safer's Motion for Summary Judgment (Doc. No. 60) is DENIED;

(7) Defendant Diane Jackson's Motion for Summary Judgment (Doc. No. 61) is DENIED;

(8) Defendants Ostrov, Spikes, Hayes, and Prison Health Services and America Services Group's Motion to Dismiss (Doc. No. 31, part 1) is DENIED.